**UNITED STATES of America,
Appellee,**

v.

**CHAS. PFIZER & CO., Inc., American Cyanamid Company and Bristol-Myers Company, Appellants.**

**Nos. 636–38, Dockets 32493–95.**

United States Court of Appeals, Second Circuit.

Argued May 7, 1969.

Decided April 16, 1970.

John E. F. Wood, New York City (Charles E. Stewart, Jr., Judson A. Parsons, Jr., David D. Griffin, J. Paul McGrath, Neal Johnston, Robert S. Wolf, Catherine A. Rein and Joseph Korff, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, Arthur G. Connolly, F. L. Peter Stone and Arthur G. Connolly, Jr., Connolly, Bove & Lodge, Wilmington, Del., of counsel), for appellant Chas. Pfizer & Co., Inc.

Roy W. McDonald, New York City (Ralstone R. Irvine, Breck P. McAllister, Richard Y. Holcomb, Kenneth N. Hart and Edward C. Mengel, Jr., Donovan, Leisure, Newton & Irvine, New York City, of counsel), for appellant American Cyanamid Co.

Merrell E. Clark, Jr., New York City (Henry J. Zafian, Terence H. Benbow, Edward A. Miller, William M. Dreyer and Robert W. Gray, Winthrop, Stimson, Putnam & Roberts, New York City, of counsel), for appellant Bristol-Myers Co.

Harry G. Sklarsky, Atty., Dept. of Justice, Washington, D. C. (Richard W. McLaren, Asst. Atty. Gen., Howard E. Shapiro, Herman G. Gelfand, George Edelstein, Robert E. Easton and William R. Weissman, Attys., Dept. of Justice, Washington, D. C., of counsel), for appellee.

Before MOORE, FRIENDLY and HAYS, Circuit Judges.

MOORE, Circuit Judge.

Chas. Pfizer & Co., Inc. (Pfizer), American Cyanamid Company (Cyanamid) and Bristol-Myers Company (Bristol) appeal from convictions after a jury trial for violations of the Sherman Act (15 U.S.C. §§ 1, 2). The indictment contained three counts, (I) "Combination and Conspiracy in Restraint of Trade"; (II) "Combination and Conspiracy to Monopolize"; and (III) "Monopolization." The defendants were found guilty on all three counts.

Two co-conspirators were named in the indictment, Olin Mathieson Chemical Corporation (Squibb) and The Upjohn Company (Upjohn). The chief executive officer of Pfizer, Cyanamid and Bristol respectively was also named as a defendant. Before trial the indictment was dismissed as to these individual defendants.

The indictment charged a conspiracy by defendants and co-conspirators to restrain trade in the broad spectrum antibiotic drug market. These drugs are enumerated more specifically later. In substance the alleged conspiratorial agreements were that:

(a) The manufacture of tetracycline be confined to Pfizer, Cyanamid and Bristol.

(b) The sale of tetracycline products be confined to Pfizer, Cyanamid, Bristol, Upjohn and Squibb.

(c) The sale of bulk tetracycline be confined to Bristol and bulk tetracycline be sold by Bristol only to Upjohn and Squibb.

(d) The sale of broad spectrum antibiotic products by the defendant companies and the co-conspirator companies be at substantially identical and non-competitive prices.

The government's bill of particulars provides the frame of reference for its claims. As to Pfizer and Cyanamid, the conspiracy to violate antitrust laws be-

gan in November 1953 and as to Bristol, Squibb and Upjohn in December 1955 (BP ¶2, 16). The alleged illegal acts were (a) in November 1953 "the illegal cross-license and bulk sales arrangement between Pfizer and Cyanamid which initiated the conspiracy in November 1953" (BP ¶27(a)); (b) Pfizer's confining the tetracycline market to Pfizer and Cyanamid in January 1954; (c) an allegedly illegal agreement in November 1955 whereby Bristol deprived Squibb and Upjohn of their right to manufacture tetracycline; and (d) illegal arrangements between Pfizer and Bristol in December 1955 settling the Bristol-Pfizer patent litigation and depriving Squibb and Upjohn of the right to manufacture tetracycline. Squibb and Upjohn were named as co-conspirators—not defendants. McKeen (Pfizer), Malcolm (Cyanamid) and Schwartz (Bristol) fixed pricing policies (e). These three individuals authorized the illegal acts (f).

The government's case, except for minor details, was constructed in large measure:

(1) upon the testimony of John E. McKeen, President and Chairman of the Board of Directors of Pfizer, Wilbur G. Malcolm, Vice-President (to September 1, 1957), President (to April 25, 1961), and Chairman of the Board of Cyanamid and Frederic N. Schwartz, President of Bristol (and prior to January 1, 1958, President of Bristol Laboratories).

(2) upon written agreements entered into between some or all of the corporate defendants, many of which agreements related to the disposition of the patent controversies which had arisen *inter sese;*

(3) upon a mass of statistical information relating to production costs, gross profits, prices, etc., of the antibiotics here involved, designed to show that the defendants were reaping unusually high profits from their antibiotic drugs; and

(4) upon some eight days of testimony and exhibits related thereto dealing with the obtaining of the Pfizer tetracycline patent.

These officials testified at length as to the business situations which confronted them during the indictment period and the reasons for the actions taken in the exercise of their judgments to meet each situation as it arose and which called for solution in the light of the facts then confronting them.

Thus the government's case, insofar as actual proof is concerned, rests almost entirely upon oral and written statements from defendants themselves. Because of this circumstance, the facts may be said to be virtually undisputed.

The indictment, as limited by the bill of particulars, constituted the mold which formed the pattern of the government's case, namely, that a conspiracy was formed by Pfizer (McKeen) and Cyanamid (Malcolm) at meetings between them in November 1953 and that Bristol (Schwartz) joined that conspiracy at meetings between McKeen and Schwartz in December 1955. Since the facts as to the happenings of these two series of meetings are critical to the government's case, they must be kept under a spotlight.

It is impossible to condense the trial (the transcript of testimony and exhibits consists of some 12,000 printed pages) except in a highly selective manner, and then only by concentrating on the determinative facts.

The subject matter of the suit was the production and marketing by Pfizer, Cyanamid and Bristol of a broad spectrum antibiotic drug, tetracycline. Prior to 1952 there were three effective drugs in this field. In September 1949 Cyanamid had obtained a patent on aureomycin which it had first marketed in September 1948. In July 1950 Pfizer had secured a patent on terramycin which it introduced on the market in March 1950. Parke, Davis (a pharmaceutical company not involved in this case either as a defendant or as a co-conspirator) in October 1949 had received a patent for chlo-

romycetin which it had put on the market in January 1949.

In 1952 a new drug, tetracycline, was developed. The activities of the three defendants with respect to this drug create the basis of the indictment's charges.

### The Pre-November 1953 Situation

Aureomycin (Cyanamid) was produced and sold exclusively by Cyanamid, was covered by patents (Duggar and Niedercorn-fermentation process) and was available to the public from December 1948.

Chloromycetin (Parke, Davis patent) was manufactured and sold to the public from 1949.

Terramycin (Pfizer) was produced and sold by Pfizer from 1950 as the sole manufacturer.

No licenses or cross-licenses were granted by any of these companies to each other or to other drug manufacturers.

Each of these drugs was a prescription drug, namely, available only on a doctor's prescription and although somewhat interchangeable their sales were dependent upon the doctor's views as to their respective effectiveness in the treatment of the particular ailment of the patient. To this extent they were competitive. Each company, taking advantage of its patents and believing in the efficacy of its product but with full knowledge of the similarity in medical usefulness of its competitors' drugs, kept a competitive eye on the prices of the others and refrained from the issuance of licenses. There had been price stability between aureomycin, terramycin and chloromycetin for several years prior to the alleged conspiracy.

Into this somewhat stable situation in the early 1950s came tetracycline, considered by many as superior to the other three.

### Tetracycline

Pfizer claimed that in June 1952 one of its scientists, Dr. Conover, had discovered tetracycline which was obtainable by subjecting aureomycin (patent held by Cyanamid) to a dechlorination process. Application was made in October 1952 for a patent on product and process claims. As a result of publicity of the Pfizer discovery, Cyanamid in March 1953 applied for a product and process patent for tetracycline. Thus there were two pending applications for patents for the same drug. To resolve the conflict, the Patent Office declared an interference.

Briefly stated Pfizer believed that it had priority (Dr. Conover—June 1952) over Cyanamid (March 1953), but the outcome was uncertain. However, Pfizer, even were it to win, was completely dependent for production, upon Cyanamid's aureomycin either by purchase or license to manufacture. In an attempt to resolve these business problems, McKeen of Pfizer and Malcolm of Cyanamid met in November 1953. There is no contention by the government that at the time of this meeting and for the years preceding it there was any conspiracy or agreement despite the similarity of the price structure of the three drugs and despite the companies' policies of not licensing others. Prior to October 1951 price reductions by one were met by the others.

### The November 1953 Meetings

None of the business practices of Pfizer or Cyanamid which occurred prior to the November 1953 meetings by the government's own specification were a part of the alleged conspiracy in issue here. If there were any, by the government's concession it was created by McKeen and Malcolm at the November 1953 meetings and not before. Two meetings between Pfizer and Cyanamid were held, the first (McKeen and Malcolm) was somewhat preliminary, the second (McKeen, Malcolm, Powers of Pfizer and Martin of Cyanamid) resulted in written agreements (January 11, 1954). The facts as to these meetings were developed by the government through these four witnesses. The sub-

ject matter of the negotiations was the tetracycline patent interference situation. If Pfizer won, its victory could have been hollow because Cyanamid controlled the vital aureomycin unless it reached an agreement with Cyanamid to obtain it. Cyanamid with its aureomycin risked being blocked from making tetracycline by Pfizer's Conover patent. To protect the respective interests of both companies, agreements were reached which provided in substance (1) that the parties exchanged proofs as to priority, the Patent Office being the ultimate arbiter and that the party prevailing should give a non-exclusive license to the other in consideration of a certain royalty, and (2) that Cyanamid would license Pfizer also non-exclusively, to make aureomycin for use in producing tetracycline and to supply certain technical information. Another important item underlying the settlement from Pfizer's point of view was the obtaining of an agreement by Cyanamid to sell Pfizer a large initial quantity of bulk tetracycline to enable Pfizer rapidly to get into the market. Thereafter proofs of priority were exchanged and as a result Cyanamid filed a concession of priority in Pfizer's favor in the patent Office on February 4, 1954.

The government does not claim that these agreements in themselves were unlawful. Although the happenings at these meetings were developed through extensive examination and cross-examination, there was no proof that these meetings involved prices, the fixing of prices, exclusion of competitors or the licensing of others. The only persons present, in addition to reciting the business reasons for the meetings and to describing at length how the then pending patent interference affected their respective companies, specifically stated that the fixing of drug prices, the exclusion of competitors or the licensing or non-licensing of others had not been discussed and that they had left the meetings as entirely free agents with no understandings of any sort on prices or licensing.

*Bristol*

Bristol, mindful of Pfizer's and Cyanamid's activities in the tetracycline field, filed in October 1953 its patent application. Although this application was rejected, it filed a separate patentability claim for tetracycline hydrochloride. This claim brought about in March 1954 an interference involving Bristol, Pfizer and Cyanamid. Despite Cyanamid's patent position, Bristol proceeded to manufacture tetracycline by a fermentation process.

Bristol, having learned in February 1954, of the Pfizer-Cyanamid concession of priority whereby it appeared most likely that Pfizer would receive a patent and concerned over a trade paper report that Pfizer would not license any other company than Cyanamid, thus potentially excluding all other competitors, communicated with Pfizer. Pfizer reaffirmed its policy not to license anyone and its intention to bring suit against manufacturers or sellers of tetracycline if in a legal position to do so. Nevertheless, Bristol in mid-1954 agreed to sell to Squibb and Upjohn bulk tetracycline, Bristol being indemnified by them against damages resulting from any infringement suit. Thus, Bristol was subjected to potential patent infringement liability.

*The Issuance of the Patent—January 11, 1955*

On January 11, 1955 Pfizer received its tetracycline patent and on the same day filed infringement suits against Bristol, Squibb and Upjohn. Bristol with its two essential customers, Upjohn and Squibb, at stake was most anxious to settle the patent litigation, particularly since there were some negotiations for a two-party settlement between Pfizer and Upjohn. To forestall this possibility, agreements were entered into between Bristol and Upjohn and Bristol and Squibb (November 1955) whereby Bristol assumed control of the patent litigation, Bristol became the indemnitor, no independent settlements with Pfizer were to be made and, if Bristol settled

with Pfizer, licenses limited to purchase, use and sale of tetracycline were to be obtained for Squibb and Upjohn.

*The Broady Incident*

Prior to December 1955 Pfizer had taken an adamant position in refusing to license Bristol. Quite unrelated to tetracycline, the trial of John G. Broady, a lawyer-investigator, had just (November-December 1955) taken place in the New York courts. Broady had been convicted of tapping telephone wires amongst which were those of Bristol and Squibb. Broady apparently had been retained by Pfizer's general counsel. Bristol threatened to use this newly discovered material in the patent litigation. Pfizer was fearful of the adverse publicity if the incident were disclosed. The Broady incident brought about a radical change in Pfizer's attitude and a meeting was quickly arranged between McKeen (Pfizer) and Schwartz (Bristol) to discuss settlement.

*The December 14th and 15th, 1955 Meetings*

The Broady incident gave to Bristol a trump card which it had not hitherto possessed and Bristol played it boldly. Since the events of these meetings bring Bristol for the first time into the conspiracy, according to the government, they must be examined with care. There were only two principal participants at these meetings, Schwartz (Bristol) and McKeen (Pfizer) and their patent counsel. No evidence of price-fixing, exclusion of competitors, restriction on licenses or the exercise of monopoly power was adduced by the government in its development of what occurred at these meetings. Both McKeen and Schwartz testified concerning the situation facing both companies as a result of the patent litigation and Schwartz added his indignation over the Broady incident. Agreement, however, was reached and a letter of intent signed (GX 95) which was followed by an agreement executed on March 25, 1956 (GX 50). Bristol requested and received for

Squibb and Upjohn licenses to purchase, use and sell (GX 51, 52).

Briefly reviewing the situation up to December 15, 1955, Bristol's policy of setting its prices at the same level as Pfizer, Cyanamid and Parke, Davis, its agreements with Squibb and Upjohn, and its limitation to two bulk customers was concededly legal and not pursuant to any conspiracy.

The government does not claim that the agreement of December 14–15, 1955 was illegal *per se;* in fact it concedes the contrary (BP 7). It further admits that Bristol's actions prior thereto were not illegal. It does stress the absence in the licenses granted of the right to manufacture but in its bill of particulars concedes that Upjohn never sought this right through its bargaining agent Bristol.

*Bristol's Post-December 1955 Activities*

There was no change in Bristol's practices after the December 1955 meetings. Prices remained as stable as in the years preceding the alleged conspiracy. Bristol reduced its costs drastically in 1954 but made no selling price reduction. As a result of developing a sales force and enabling Squibb and Upjohn to market tetracycline products, Bristol's percentage of the market increased substantially with a consequent diminution of Pfizer's and Cyanamid's shares.

*The Trial*

The stage had been set in the indictment and bill of particulars for a trial upon the issue of conspiratorial agreements reached at specific times (November 1953 and December 1955) between specific persons (McKeen-Malcolm; McKeen-Schwartz). The bill of particulars alleged that:

"27. (a) McKeen and Malcolm personally negotiated the illegal cross-license and bulk sales arrangement between Pfizer and Cyanamid which initiated the conspiracy in November 1953.

\*   \*   \*   \*   \*   \*

"(d) McKeen and Schwartz personally negotiated the illegal arrangements in December 1955 which resulted in Squibb and Upjohn being deprived of any right to manufacture tetracycline, in their being required to purchase all tetracycline requirements from Bristol and also resulted in settlement of all litigation with Pfizer involving the validity of the Pfizer tetracycline patent.

"(e) McKeen is the person who has been responsible for Pfizer's pricing policy on broad-spectrum antibiotics; Malcolm is the person who has been responsible for Cyanamid's pricing policy on broad-spectrum antibiotics; Schwartz is the person who has been responsible for Bristol's pricing policy on broad-spectrum antibiotics."

Before the openings by counsel, the trial court by way of preliminary instructions had stated to the jury that the conspiracy included "the creation of uniform, non-competitive and unreasonably high prices to the users of broad spectrum antibiotics." In its opening the government had stressed "enormous" profits by comparing factory cost and selling price and gave as an illustration of Cyanamid's 1954 cost a figure of $2.-55 production cost for 100 capsules, a 1956 cost of $1.76 and a 1958 cost of $1.59 against a selling price to the druggist of $30.60 and $51 to the consumer.

The government conceded that production cost did "not include such items as research, promotion, advertising, executive overhead and things like that" but asked the jury to consider the significance of low production cost in relation to selling prices. The jury was also told that even in the pre-conspiracy, pre-tetracycline days there were "unreasonably high profits involved."

At the conclusion of the government's opening defendants moved for a mistrial because of its allegedly misleading prejudicial and inflammatory statements as to unreasonably high prices and profits. The motion was denied.

During the early weeks of trial, the government proceeded to offer a vast amount of testimony and scores of exhibits relating to factory production costs and alleged profits. To all of this proof defendants made objections which were overruled and at the end of the government's case they moved to strike all evidence relating to prices and profits during the conspiratorial period (November 1953–September 1961) and during the period prior to 1953 when the conspiracy was conceded not in existence. The motion was denied.

*The Government's Summation as to Profits*

The government devoted much of its summation to the profits obtained by the respective defendants from their particular drugs (illustrative: "in those seven years Bristol made approximately $57 million in profits"—$69 million, production cost $12 million). "In 1954 it cost Cyanamid $2.26, in 1955 it cost them $1.57. That listed for $51. The druggist paid $30.60—2,000% mark-up. * * * I think it is a fair inference from this chart that Cyanamid and Pfizer and Bristol starting in 1956 were making an unreasonably high profit."

I.

Amongst other grounds defendants seek reversal because they claim that the court in its submission of the issues to the jury departed radically from the indictment's allegations and the bill of particulars as to the formation of the conspiracy. This point is based upon the specification in the bill of particulars that the conspiracy came into existence in November 1953 and December 1955 and that it was the result of meetings between specific individuals. Defendants claim that they rested (except for recalling one witness) at the close of the government's case, expecting the case to go to the jury on that theory. They assert that the court, instead of charging the jury that the conspiracy as alleged must be found within the scope of the indictment and bill of particulars,

in fact charged the opposite in instructing that the central requirement of an agreement "does not mean, however, that in order to create an unlawful combination or a conspiracy, the parties must meet together at some time or place or, indeed, that they must meet together at all"; "that proof of a conspiracy does not necessarily require proof of express agreements or proof that the alleged conspirators had any face-to-face meetings at all"; and despite the government's introduction of the written agreements that "This is rarely the way in which criminal conspiracies are formed."

Had the government relied on a general course of conduct throughout the years, these instructions might well have been apposite. But this was not such a case. The vast amount of time taken by the government in stressing high prices and profits and alleged patent frauds, together with the court's charge deprecating the testimony of defendants' officers, may well have succeeded in diverting the jury from the real issues as framed by the indictment and bill of particulars.

Defendants contend that the charge as given cut the government loose from the theory on which it had tried the case and allowed the jury to convict on the basis of conduct during the indictment period without making the essential decision as to whether agreements were actually made at the meetings.

Instead of charging that the government had relied (Bill of Particulars) on specific dates and specified individuals, the court charged that:

"While the prosecution alleges approximate dates for the commencement of the conspiracy, and charges that the conspiracy continued up to the date of the indictment in August 1961, it is not necessary that the precise dates or extension of the conspiracy throughout the period be proved in order to establish the charges. If you find all the other elements established, it would be sufficient for Counts 1 and 2 if you found that the conspiracy existed and was continued for any substantial portion of the five-year period ending at August 17, 1961."

Along the same lines were the instructions that

"This central requirement of an 'agreement' does not mean, however, that in order to create an unlawful combination or a conspiracy, the parties must meet together at some time and place or, indeed, that they must meet together at all. Nor does it mean that their undertaking must be embodied in express or formal contractual statements, or express words of any kind.

\* \* \* \* \* \*

"Because express agreements are neither necessary nor common in establishing unlawful conspiracies the crime is one which may be shown from circumstantial evidence as to a course of conduct or business dealings. In other words, whether the prosecution has sustained its burden of proving a conspiracy must frequently be judged by what the jury finds the parties actually did rather than from the words they used.

\* \* \* \* \* \*

"Along with all the other evidence in the case, you have heard the sworn testimony of the principal officers of the three defendant companies, and you have heard each of them deny in broad terms that there was any understanding or agreement among them, either express or implied, that there would be uniform and identical prices, or that there would be any exclusion of competitors, or that they would seek together in any way to achieve monopoly power. You must, obviously, give due and deliberate thought to this testimony, and ultimately attribute to it such weight as it permits in your impartial judgment. In performing this task, you will have in mind the definition of a combination or conspiracy as it has been given to you in these instructions, recalling, among other

things, that the final answer to this central question in this case must be based upon the actual conduct of the defendants during the period covered by the indictment, and that the things the defendants did and said at the time may in such a case be weightier than the things they say thereafter."

To this charge defendants took exception, saying: "We tried the entire case pivoting around those[1] dates and I think it would be a variance against the indictment and the bill of particulars and the contentions of counsel in the opening to leave it in the jury's mind, any doubt if they decide Bristol joined later." Cyanamid and Pfizer joined in the exception to the charge that "it was not essential and not necessary that the precise dates be established."

Defendants had asked the court to instruct the jury that "The defendants, under the law, were entitled to rely on the Government's bill of particulars, taken together with the indictment, as a fair statement of what the issues in this case are about, and what they are not about." And that "You must evaluate the evidence in the light of the charges made in both the indictment and the bill of particulars. You cannot find any defendant guilty on the basis of some charge not made in the indictment as supplemented by the bill of particulars, nor may you convict on a basis which is different or contrary to the specific charges in the indictment as supplemented by the bill of particulars." (Cyanamid Suppl. Reg. No. 2)

The request was denied.

The government had as part of its direct case called as its witnesses the only key officers of defendants present at the face-to-face critical meetings in November 1953 and December 1955. In their long cross-examination of their own officers, defendants had focused on refuting what the government claimed had happened at the meetings, and then rested on the assumption that the meetings would be treated as an important part of the case. Although in its charge the court spent much time discussing the circumstantial evidence, it slighted and rather deprecated the testimony about the meetings which was vital to any jury decision as to the existence of a conspiracy.

The suggestion by the court that the jury should not reject the testimony of defendants' officers was followed by what might well have been regarded as a skeptical view as to their "assertions of innocence." But the officers had gone far beyond "assertions of innocence." They had testified at length concerning the business problems created by the tetracycline patent situation, how it affected their respective companies and how settlements instead of long-drawn-out and costly litigations appeared to be the wiser course. Furthermore, the officers' "assertions of innocence" included specific statements that particular subjects had not been discussed and that they had left the meetings as entirely free agents with no understandings of any sort on prices or licensing. To allow the jury to convict without finding that these denials were untrue would free the government from its basic theory of the case and allow it to rely on any understanding that might be inferred from other conduct. When the judge instructed that "assertions of innocence by such officers may reflect partly legal as well as factual contentions," meaning that the officers might be using "agreement" in an overly narrow sense, he was disregarding testimony that no understanding of *any* sort was formed at the meetings, and probably did confuse the jury about what parts of the testimony bore factually on whether a conspiracy had been formed. Thus, in effect, the charge nullified the testimony of defendants' officers as to the business reasons for the intercompany agreements and permitted the jury to infer a conspiracy from afterevents, which were relevant only insofar as they tended to show that an agreement was reached *at the meet-*

---

[1]. November 1953; December 1955: 5011a, 5012a.

*ings.* The charge not only did not focus the jury's attention on this but may well have led to a contrary view on their part.

A review of the entire charge leaves the definite impression that although the circumstantial evidence and "unreasonably high profits" aspects of the case were stressed, the key issue as to the formation of the conspiracy as particularized by the government was not given proper attention and the importance of establishing a conspiracy as charged so minimized that there can be no assurance that the jury was not misled to defendants' serious prejudice.

More specifically, one-third of the charge was devoted to such necessary generalities as reasonable doubt, circumstantial evidence, the indictment and the applicable law. Possible fraud on the Patent Office consumed one-quarter and the claim of unreasonably high prices one-sixth. Thus three-quarters of the charge did not relate to the key issue, namely, the formation of the conspiracy as specified in the bill of particulars. Except for mentioning the November 1953 and December 1955 dates, there was nothing in the charge which focused the jury's attention on the primary issue which they were to resolve, namely, did the participants as those meetings conspire to carry out the program as alleged by the government?

In contrast to concentrating on the conspiracy as alleged, the government in its summation and the court in its charge virtually ignored the allegedly conspiratorial meetings. Instead, the patent situation and high prices were stressed.

With respect to the Patent Office proceedings, the case for this purpose was virtually diverted from an antitrust conspiracy case to a patent fraud case.

The government's theory of fraud on the Patent Office, in brief, is based upon the question of the presence of tetracycline in aureomycin. The Patent Examiner had expressed the view that if any identifiable amount of tetracycline were present in aureomycin, a patent would not have been issued to Pfizer. The government claims that to enable Pfizer to obtain the patent, Cyanamid falsely represented to the Examiner that tetracycline was not present and that Pfizer was aware of this collaboration.

The jury were instructed as to the duty of applicants to disclose prior art and other facts material to the allowance of a patent and as to the withholding of information with intent to deceive. They were asked to resolve the dispute as to "what information was, in fact, of interest to the Examiner and whether the answers to his questions were deliberately unresponsive and misleading." The procedure in the Patent Office was outlined, the scope of patent claims, the way a Patent Examiner proceeded to determine the claims to which an applicant might be entitled, the further steps an applicant might take after rejection, namely, reconsideration or amendment and an appeal after final rejection to the Board of Appeals. All were explained. The evidence before the Patent Examiner was described in detail, including his speculations that the patentees, Duggar and Niedercorn, might have had co-production of tetracycline with aureomycin without recognizing it. As previously stated a quarter of the lengthy charge was devoted to the patent aspects, but nowhere was the jury told in clear language that the Patent Office proceedings were relevant only insofar as the acts of Pfizer and Cyanamid supported an inference that at the November 1953 meetings they had entered into agreements to fix prices or to exclude others.

Towards the end of the charge, ten pages were expended on the relation of allegedly unreasonably high prices. The court charged that " * * * uniform prices, maintained at a constant level over long periods of time—if such prices are artificial and unrelated to supply and demand or to other variations or changes in the pertinent economic factors—may be considered by you as some evidence from which an agreement or

understanding or concerted action to restrain trade may be inferred."

The court read to the jury the last three of the "means and methods" charged in the indictment, namely:

"1. Pfizer and Cyanamid maintained substantially identical and unreasonably high prices on Terramycin products and Aureomycin products, respectively.

"2. Pfizer, Cyanamid, Bristol, Upjohn and Squibb each introduced its tetracycline products on the market at prices which were substantially identical with each other and which conformed to the prices of Terramycin products and Aureomycin products in effect as of November 1953, and all these companies maintained such substantially identical and unreasonably high prices until at least July 1960.

"3. Pfizer, Cyanamid, Bristol, Upjohn and Squibb each introduced its tetracycline products on the market in dosage forms and customer classifications substantially identical with the Terramycin products and Aureomycin product dosage forms and customer classifications in effect as of November 1953, and have continued to use such substantially identical dosage forms and classifications to date."

Referring to the government's contention "that broad spectrum antibiotic sales comprised a major portion of the business, and a major source of the profits, of the defendant companies in varying proportions," the court charged that these assertions "may be considered as part of the general background and setting in which the events of the case transpired." The court told the jury that they could ask themselves "whether price cuts or price changes of any kind would seem to have been indicated or desirable for any of the companies involved from the viewpoint of their self-interest." The court instructed that "neither the Sherman Act nor any other law that concerns us in this case imposes any limit on the price a company may charge for its commodity" and that the jury should not be influenced "by any notion that drug prices were too high or too low or even just right" and explained its reason for allowing cost and profit data in evidence because thereby the government sought to establish (presumably by inference a conclusion of conspiracy) stability of prices over a long period of time despite a disparity of production costs and market shares amongst the defendants.

Defendants take particular exception to two portions of the charge relating to profits and costs. They say as to profits that the charge that "Unreasonably or extraordinarily high prices or profits charged uniformly by competing sellers over a substantial period of time may be evidence, taken with all the other circumstances of the case, supporting an inference that the parties had an agreement rather than a competitive situation with respect to prices," and was not justified and could well have misled the jury.

As to costs the court charged:

"There has been evidence of so-called 'production costs' or 'factory' or 'standard' costs from records kept by the companies, and comparisons in these records between such costs and selling prices. Many of these records omit many factors that should be included in costs in order to compute net profits. Such factors, without exhausting them, were research, promotion expenses, and other kinds of costs. You should have these omissions in mind and take them into account when you consider the figures I have just mentioned."

This instruction, defendants argue, permitted the jury, without the benefit of any proof of the "many factors that should be included in costs in order to compute net profits" or the factors which defendants have represented as constituting 90% of true cost, to speculate as to what proper costs would have

been. The absence of the factors, which the court stated had been omitted, namely, "research, promotion expenses, and other kinds of costs," gave to the jury they say, without any proof of what the omissions might have been, uncontrolled discretion to keep "these omissions in mind and take them into account when you consider the figures." Defendants contend that with 90% of the material essential to an accurate determination of costs withheld from the jury by exclusion, it was being instructed "to reach its verdict on its own crude lay notions and subjective impressions as to whether prices and profits were 'unusual,' 'artificial,' 'extraordinary' or 'unreasonably high.'"

■ The jury thus entered upon its deliberations with its attention diverted from the real issues to patent fraud and unreasonably high prices—both inflammatory issues. Quite apart from their relevance, these so-called means and methods could well have so prejudiced the jury that it either failed to resolve the primary issue or subordinated it to the issues stressed. Because of this real possibility, defendants Pfizer, Bristol and Cyanamid are entitled to a new trial.

## II.

Defendants also seek reversal because the court, after receiving evidence of the marketing practices and policies of Parke, Davis (not a defendant) which was concededly not engaged in the alleged conspiracy, improperly placed restrictions on them by refusing to permit them to argue to the jury the effect of this evidence upon their innocence or guilt. In addition, these defendants claim reversible error in the charge actually given with respect to Parke, Davis' role in the antibiotics field.

Although the court said that "I will allow everybody to risk arguments in summation based on comparisons between the defendants and Parke, Davis," it ruled that "I will sustain objections to arguments based on the legal notion of the presumption of innocence which I think has no place in that discussion and I think it would be an incorrect legal approach to the subject. * * * because I don't think you should be asking the jury to draw any inferences from the presumption of innocence relating to a party which is not on trial." The ruling was broadened by the court's excluding reference to "a presumption that business is conducted lawfully."

Parke, Davis during the critical years of the alleged conspiracy manufactured and sold the antibiotic, chloromycetin. It was the second largest in the antibiotic field, accounting for some 24% of all sales. In the years preceding the alleged conspiracy, its prices paralleled those of the other companies. It had never licensed others under its patent and had never made bulk sales. The government not only conceded but affirmatively stated "on the record" that Parke, Davis was not a conspirator. Naturally defendants sought to capitalize on the fact that Parke, Davis, as a non-conspirator, engaged in the same marketing practices which the government charged created a beyond-reasonable-doubt inference of conspiracy on their part.

The court instructed the jury that "Parke, Davis is not alleged to have been a member of the conspiracy charged by the government" and that they could take into account Parke, Davis and its activities insofar as they were material factors but then said:

> "However, the fact that Parke, Davis has not been indicted and is not a defendant has no relevance whatsoever in any direction as a fact in itself. There is no profit here in speculating as to why Parke, Davis was not indicted. Parke, Davis is not on trial here, and the verdict concerning the defendants which are on trial must be based in the end on the law and the evidence relating to them as they have been presented to you in this courtroom."

The evidence as to Parke, Davis' conduct was all-important to the defend-

ants. The government had introduced at length proof as to Parke, Davis' practices and policies during the period preceding, and included in, the indictment. A stipulation of facts stipulated that Parke, Davis had a patent on its antibiotic, chloromycetin; that "Prior to August 17, 1961, Parke, Davis did not grant any licenses under its Chloramphenicol (chloromycetin) patent"; that "Parke, Davis made no bulk sales of Chloromycetin." Similarity of price structure intentionally adopted for business reasons was also established.

The charge as given could well have had the effect of stressing the failure to indict, thus carrying the connotation that Parke, Davis might have been guilty but was not indicted for undisclosed reasons. Furthermore, in limiting the jury's consideration to the "Evidence relating to them [defendants] * * *," the court lessened, or might have foreclosed the giving of, any weight which the jury might have attributed to the evidence of Parke, Davis' conduct.

Exception was taken, counsel saying: " * * * we believe that the juxtaposition of these two charges has the effect of informing the jury that they are not to consider the fact that Parke, Davis followed parallel conduct in many aspects of the marketing of an interchangeable drug as a basis for an inference that such conduct was innocent."

Cyanamid had endeavored to bring the similarity of Parke, Davis' non-conspiratorial business activities before the jury in its request that the jury be instructed:

"You have heard counsel from time to time throughout the trial refer to what Parke, Davis did and did not do, and there has been evidence admitted as to Parke, Davis' actions, including the testimony of Mr. Loynd its former chief executive officer and facts as to Parke, Davis which were stipulated between the Government and defendants. Although Parke, Davis was neither indicted nor claimed to have been a co-conspirator in this case, evidence of its actions and its relative size in the broad spectrum antibiotics market is relevant and should be considered during your deliberations.

"The evidence is undisputed that Parke, Davis had a patent on its broad spectrum antibiotic product, Chloromycetin, and that during the period covered by the indictment it granted no licenses under that patent and it did not sell Chloromycetin in bulk. It is an undisputed fact that during the period 1954–1961, Parke, Davis' sales of Chloromycetin accounted for 23.8% of sales in the broad spectrum antibiotics market alleged in the indictment, and Parke, Davis was the second largest seller in that market during that time. There is also evidence that Parke, Davis during most of the period covered by the indictment had substantially the same prices on its Chloromycetin products as defendants had on comparable dosage forms and package sizes of the broad spectrum products which they sold.

"You are entitled to consider the extent to which the evidence may show that Parke, Davis engaged in conduct which the Government claims proves conspiracy, and the further fact that no one claims that this conduct by Parke, Davis was pursuant to the conspiracy claimed by the Government."

Had defendants been allowed to argue without restriction the full effect of the Parke, Davis marketing policies and procedures, defendants could have stressed that Parke, Davis quite independently of any conspiracy had paralleled defendants in its pricing and licensing practices both before and after the commencement of the alleged November 1953 conspiracy. The interest of the jury in Parke, Davis was evidenced by requests during their deliberations on two occasions for Parke, Davis evidence.

■ The restrictions placed upon defendants with respect to the Parke, Davis proof and the failure to present to the

jury the substance of defendants' requests to charge constitute sufficient prejudice as to require a new trial.

### III.

*The Licenses to Squibb and Upjohn*

The government placed great importance in support of its conspiracy-to-exclude argument upon the transactions between Bristol, Squibb and Upjohn in November 1955 and the Bristol-Pfizer agreements in December 1955. The conclusions, implications and inferences which the jury might draw from these agreements, of necessity were guided, and controlled by the court's instructions as to the legal effect of the agreements. Depending upon the court's construction of the consequences of the agreements, the jury would enter upon its deliberations as to whether they supported, or were indicative of, the indictment charges.

The situation in November 1955 vis-a-vis Bristol, Upjohn, Squibb and Pfizer was (1) outstanding contracts for the sale of bulk tetracycline by Bristol to Squibb and Upjohn; (2) an infringement suit by Pfizer against Bristol, Squibb and Upjohn; (3) extreme concern by Upjohn over its potential liability to Pfizer, which concern caused Upjohn to explore with Pfizer the possibility of a separate settlement; (4) Bristol's efforts to avoid a separate settlement; and (5) Bristol's consummation of the bulk sales agreements with Upjohn and Squibb.

These agreements (November 3rd and 18th) with Upjohn and Squibb respectively looked towards a hoped-for settlement between Bristol and Pfizer and in anticipation provided for a license in any such settlement from Pfizer to Upjohn (and to Squibb) which license "may, however, be limited to your right to purchase, use and sell tetracycline to the drug trade."

However, the propriety of these contractual arrangements is not questioned by the government as to Bristol. Thus in its summation the government said:

"until the time they made that deal— Schwartz made that deal with McKeen in December 1955, there is nothing about the activities of Bristol that we criticize or say are illegal."

The pre-December 1955 transactions, however, were by no means excised from the case because the government proceeded to argue that the "restrictive arrangement" in the November 3, 1955 agreement had a sinister connotation, and was a part of Bristol's scheme to hold Upjohn and Squibb more securely as purchasers of its bulk tetracycline. The government even brought Pfizer into the picture by imputing that the license to sell and use was a Bristol-Pfizer plan to restrict Upjohn and Squibb.

Instead of instructing the jury that the concededly legal November 1955 Bristol-Upjohn-Squibb agreements could not be considered a part of any conspiracy, or, charging, as requested by Bristol that:

"The fact that Pfizer agreed to Bristol's request that Pfizer give to Upjohn a license to purchase, compound, use and sell tetracycline, does not amount to an agreement or understanding by Pfizer with Bristol under which Pfizer promised not to grant manufacturing rights to Upjohn." Bristol's Request No. 32A.

the court not only failed to give such instructions but by its actual charge gave its own, and in our opinion incorrect, interpretation of the agreements.

After referring to the government's contention that there was a restriction forbidding manufacture by Squibb and Upjohn, the court charged that "The critical inquiry on this score is whether the limitation on Squibb and Upjohn, which barred them from manufacturing, was the particular objective of Bristol and was an agreed objective between Bristol and Pfizer in the issuance of that license."

The agreements, however, disclose that there was nothing therein which barred them [Upjohn and Squibb] from manufacturing or which forbid manu-

facture. In fact there were no restrictive phrases whatsoever. Bristol undertook affirmatively *if* the patent litigation were settled "(2) to secure for you [Upjohn] a direct license under said patent which *may,* however, be limited to your right to purchase, use or sell tetracycline. \* \* \*" (GX 108) (emphasis supplied). The possibility of securing a license to "purchase, use and sell" is a far cry from an undertaking forced upon Upjohn and Squibb by Bristol and Pfizer which forbade and barred manufacture. Any bar, which there might have been, would have been the natural legal consequence of Pfizer's patent. All that the licenses accomplished was to lessen the patent restrictions The court, having incorrectly assumed that this bar existed, submitted to the jury the question of "whether the limitation on Squibb and Upjohn, which barred them from manufacturing \* \* \* was an agreed objective between Bristol and Pfizer in the issuance of that license." The jury, in being so advised, might well have concluded that the December 1955 Bristol-Pfizer agreement was, in fact, a bar which violated the antitrust laws and that Bristol and Pfizer had collaborated in imposing restrictions which otherwise did not exist.

Furthermore, the term "restriction" was used alternately to characterize the licenses and to describe what Pfizer and Bristol were forbidden to agree on. The net result was that the charge might be read to contain this syllogism: Pfizer and Bristol were forbidden to agree to restrict licenses to others; the licenses given imposed restrictions on Squibb and Upjohn; Pfizer and Bristol agreed on those licenses; therefore, Pfizer and Bristol did what they were forbidden to do. But there was nothing illegal in Bristol's November 1955 undertaking to try to obtain from Pfizer purchase, use and sell licenses for its customers, Upjohn and Squibb. When Bristol and Pfizer met a few weeks later and concluded their settlement, Bristol's con-

tractual obligation was to secure for Upjohn and Squibb the licenses to which the parties had agreed, namely, purchase, use and sell. It was scarcely Pfizer's duty to insist upon Bristol broadening the type of license requested. Except for the abortive independent attempt on Upjohn's part to explore settlement possibilities directly with Pfizer, there was no proof that the right to manufacture was asserted as a prerequisite condition in connection with either the November 1953 or the December 1955 agreements.

And finally, Squibb and Upjohn did not need licenses as a matter of law to sell tetracycline which they purchased from Bristol, a licensed manufacturer.

## IV.

Bristol's participation in the tetracycline race is highly significant. It can be construed, as Bristol would have it, as evidence of a very competitive situation, with Bristol determined to assert a position in the field, or upon the government's theory, as proof of acts from which an inference of conspiracy with Pfizer and Cyanamid can be drawn.

The indictment had charged that the "combination and conspiracy was effectuated by various means and methods including, but not limited to, the following:" Twelve subsections are set forth. Those referring to Bristol are:

"(a) Cyanamid licensed Pfizer and Bristol to use its Aureomycin patent in the manufacture of Tetracycline and refused to license all other applicants."

"(b) Pfizer licensed Cyanamid and Bristol under its Tetracycline patent and refused to license all other applicants."

"(d) Pfizer, Cyanamid and Bristol suppressed litigation involving the validity of Pfizer's Tetracycline patent."

"(e) Pfizer and Cyanamid and Bristol.\*] withheld pertinent and

---

\* Charges withdrawn as to Bristol.

material information from the Patent Office and otherwise misled the Patent Office prior to the issuance of Pfizer's Tetracycline patent."

"(g) Bristol sold bulk Tetracycline only to Upjohn and Squibb. * * *"

"(h) Bristol entered into agreements with Upjohn and Squibb respectively which required Upjohn and Squibb to purchase all their requirements of bulk Tetracycline from Bristol."

"(k, l) Pfizer, Cyanamid, Bristol, Upjohn and Squibb introduced their Tetracycline products on the market at substantially identical prices and all maintained such prices until at least July 1960."

The government offered proof in support of these means and methods. All, however, preceded the date upon which Bristol is alleged to have entered the conspiracy. Specifically, the Cyanamid license was received in January 1955, Bristol's bulk sales to only Squibb and Upjohn commenced in September 1954, the requirement contracts were in November 1955, and marketing at substantially identical prices started as early as May 1954.

Although the efficacy of instructions limiting this evidence against Bristol at the time of receipt is questionable, its harmful effect upon Bristol could only have been minimized by the clearest instructions that the jury should not consider Bristol's part in any of the events prior to December 14–15, 1955 as proof of Bristol's being in any conspiracy. Failure so to charge plus the affirmative charge that "it is not necessary that the precise dates or extension of the conspiracy throughout the period be proved in order to establish the charges," could well have caused the jury to believe that Bristol was involved in a conspiracy long before December 14–15, 1955. A comprehensive charge as to these prior events became all the

more important because the government, in effect, had put its stamp of legality on identity of price and restricted bulk sales. It was thus incumbent upon the government to prove beyond a reasonable doubt by some reverse alchemistic process that acts which had been legal had by some action taken at the December 14–15 meetings been changed merely by continuance into acts thereafter illegal.

■ There was no direct proof of conspiracy to be found in the Schwartz-McKeen versions as developed extensively on direct and cross-examination relating to the December 14–15, 1955 meetings. Nothing illegal is to be found in the written agreements embodying the understandings reached. But, in a case so wholly dependent for conviction upon the jury's drawing of inferences in direct contrast to the statements of the witnesses present and the documents evidencing their agreement, the importance of instructions cannot be overemphasized. An appellate court has no means of knowing what factors were decisive in the jury's collective mind in reaching their verdict. However, here we can say that failure to differentiate between the legal and the illegal was prejudicial error.

In conclusion, the government elected to make specific charges of agreements made at specific times between specific individuals which agreements, it alleged, constituted the conspiracy to do the illegal acts charged in the indictment and bill of particulars. The case, as tried, covered practically every phase of the development and marketing of the four so-called wonder drugs, aureomycin, chloromycetin, terramycin and tetracycline over a period of more than ten years.

Probably, of necessity, the government virtually had to ignore or at least play down the business reasons asserted by the defendants' executives as motivating their agreements and the actions taken by them and to concentrate on the possibly more jury appealing aspects such as

abnormally high prices and profits and patent fraud. It was from such proof that the jury was asked to infer conspiratorial agreements which the government had not established through the principals at the November 1953 or the December 1955 meetings or through the written agreements themselves except as read in connection with other facts.

Under these circumstances it was highly important that the jury's attention be directed in the charge to the primary issue framed by the government. But as the case was submitted to the jury, this issue was subordinated in government summation and charge to the more inflammatory issues of illegally exorbitant prices charged to a victimized public and patent fraud. But the conspiratorial agreements, as charged, did not emanate from these issues.

A review of the entire record leads to the conclusion that the judgments of conviction against Cyanamid, Pfizer and Bristol must be reversed and that a new trial be had as to them.

HAYS, Circuit Judge (dissenting).

I respectfully dissent.

## 1. *General*

"On appeal from the convictions the evidence is to be viewed in the light most favorable to the government and all permissible inferences are to be drawn in its favor. United States v. Kahaner, 317 F.2d 459, 467 (2d Cir.), cert. denied, 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963); United States v. Hall, 346 F.2d 875 (2d Cir.), cert. denied, 382 U.S. 910, 86 S.Ct. 250, 15 L. Ed.2d 161 (1965); United States v. Marchisio, 344 F.2d 653 (2d Cir. 1965)." United States v. Jones, 374 F.2d 414, 419 n. 2 (2d Cir.), cert. denied, 389 U.S. 835, 88 S.Ct. 40, 19 L.Ed.2d 95 (1967). Although the evidence against appellants is not overwhelming, viewed in the perspective of our limited scope of review it is sufficient.

The indictment charged defendants, in three counts, with having combined and conspired in restraint of trade in the broad spectrum antibiotic market, with having combined and conspired to monopolize that market, and with having illegally monopolized it. It was alleged that defendants conspired to exclude competitors and to fix prices and that, having sufficient market power to do so, defendants succeeded in accomplishing the objects of their conspiracy.

The government's evidence establishes that the price of tetracycline, a broad spectrum antibiotic controlled by defendants and having a very large sale, did not change at all from 1953 until 1960. Throughout that whole period each defendant charged exactly the same amount although Pfizer and Cyanamid were consistently producing tetracycline at a cost substantially lower than the production costs of Bristol, Squibb and Upjohn. Pfizer and Cyanamid allowed themselves to lose significant portions of their market to the higher cost producers without ever attempting to regain those portions by cutting prices. Although the production costs of all producers markedly decreased, the resulting savings were not reflected by any price reductions.

The agreement to exclude competitors centers on the 1953 patent settlement between Pfizer and Cyanamid. Pfizer licensed Cyanamid to produce and sell tetracycline while Cyanamid licensed Pfizer to manufacture, though not to sell, aureomycin. Neither Pfizer nor Cyanamid, then, with Parke-Davis, the only producers of broad spectrum antibiotics, had previously licensed any other drug companies to produce or sell their respective broad spectrum antibiotics. The government presented evidence from which the jury could infer an agreement between Pfizer and Cyanamid that Pfizer would not license anyone other than Cyanamid to manufacture tetracycline. Shortly after their meeting at which the parties had the opportunity to discuss such an agreement Pfizer publicly announced that the company policy was not to issue any licenses for tetracycline. That policy was strongly impressed upon Bristol, Squibb

and Upjohn, and almost certainly would have resulted in litigation had the Broady wiretap incident not intervened. The point at which the understanding between the parties merged into an agreement is, perhaps, difficult to define with precision, but this constitutes no reason for denying to the jury the power to conclude that such an agreement existed.

### 2. *The Issues of Patent Fraud and Unreasonably High Prices*

The court's instructions on the issues of patent fraud and unreasonably high prices were entirely proper. The evidence introduced on these issues tended to support the charge of conspiracy.

The government did not contend that Pfizer and Cyanamid agreed to defraud the patent office, but only that their conduct was evidence of the underlying conspiracy to exclude competitors. The jury would have been justified in finding that Pfizer's statement to the patent office that the processes of the prior art produced no tetracycline was deliberately false and that it was made in the expectation that Cyanamid would not challenge the statement. Cyanamid's participation in such a course of conduct is readily explainable by its expectation that it would be Pfizer's sole licensee.

The evidence relating to the high price level for broad spectrum antibiotics was equally relevant to the issue of conspiracy. There was evidence that the price for the antibiotics remained the same notwithstanding differences in costs among the defendants, notwithstanding overall decreases in costs through the period of the conspiracy, and notwithstanding changes in the market percentages controlled by each defendant. The jury would be justified in finding that the failure of any defendant at any time over a period of seven years to lower these extremely high prices evidenced a conspiracy. Defendants attempted to convince the jury that the oligopolistic nature of the broad spectrum antibiotics market made the ordinary concept of a competitive market irrelevant. The jury was not compelled to accept defendants' representations, and we are not justified in questioning its refusal to do so.·

The government's substantial evidence as to the level of profits enjoyed by defendants from the sale of broad spectrum antibiotics was also relevant on the issue of conspiracy. Its relevance lies in the fact that, when profits were so enormous, defendants could have been expected, in the absence of a conspiracy, to experiment with price reductions in an effort to increase percentage of sales.

Defendants also complain that the evidence was improperly admitted because the government introduced no evidence of comparative prices from which the jury could properly conclude that defendants' profits were unreasonably high. The government did introduce evidence relating to the profits realized by the drug companies on penicillin and on other drugs. The evidence shifted the burden to defendants to convince the jury of the inapplicability of the standards suggested by the government.

Defendants argue that the jury was given an erroneous impression of their level of profits by the introduction of evidence relating to production costs rather than to total costs. Defendants had it within their power to introduce their own evidence on costs. The relevance of production costs was clearly established by the government's showing that defendants relied on production cost data both in internal memoranda and for establishing the industry-wide "rule of thumb" price level of approximately three times production costs.

### 3. *Parke, Davis*

The jury was instructed that the evidence concerning Parke, Davis was part of the total evidence that it should consider in reaching its verdict. It was then told, however, that "the fact that Parke, Davis has not been indicted and is not a defendant has no relevance whatsoever in any direction as a fact in itself. There is no profit here in speculating as to why Parke, Davis was not indicted.

Parke, Davis is not on trial here * * *" It is claimed that the effect of this instruction was to detract from the force of the testimony concerning Parke, Davis. The defendants' theory is that Parke, Davis, which was not indicted, conducted its activities in the same manner as defendants and the accused co-conspirators, and that the jury should consider, therefore, whether defendants had not in fact been acting consistently with good business practices rather than with a conspiracy. The construction that defendants place on the charge is a possible construction but, in terms of the charge as a whole, that possibility seems hardly serious enough to warrant reversal.

### 4. *Licenses to Squibb and Upjohn*

The jury was instructed that "[t]he critical inquiry on this score is whether the limitation on Squibb and Upjohn, which barred them from manufacturing, was the particular objective of Bristol and was an agreed objective between Bristol and Pfizer in the issuance of that license." The instruction might have been construed by the jury to mean that but for the restriction Squibb and Upjohn would have had the right to manufacture tetracycline, whereas in fact there would have had to be a specific grant of permission.

It seems to me to be quite unlikely that the jury was seriously misled by this instruction. The settlement did not grant Squibb and Upjohn the right to manufacture, and the real issue was whether Pfizer had declined to grant that right at Bristol's request.

### 5. *Bristol*

Bristol settled on its own behalf and on behalf of Squibb and Upjohn their suits against Pfizer and Pfizer's suits against them. In the settlement Bristol obtained licenses to manufacture and sell tetracycline, while Squibb and Upjohn obtained licenses which prevented them from making bulk sales.

The restriction imposed on Squibb and Upjohn precluding the resale of bulk tet-

racycline suggests an agreement to exclude competitors. In addition, the circumstances of the settlement—including the private discussion between McKeen and Schwartz (allegedly about the Broady wiretap incident about which all the other participants in the meeting already knew anyway)—were sufficient to justify the jury in finding that the parties agreed upon the desirability of keeping as small as possible the number of manufacturers and therefore granted Squibb and Upjohn only the minimal license that would satisfy Bristol in its settlement with Pfizer.

I would affirm the judgment.