**UNITED STATES of America,**
**v.**
**CHAS. PFIZER & CO., INC., et al.,**
**Defendants.**

**No. 61 Cr. 772.**

United States District Court,
S. D. New York.

Nov. 30, 1973.

Harry G. Sklarsky, Atty., Dept. of Justice, Washington, D. C. (Herman G. Gelfand and Norman H. Seidler, Attys., Dept. of Justice, Washington, D. C., of counsel), for the United States.

John E. F. Wood, New York City (J. Paul McGrath and Catherine A. Rein,

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, Julian O. von Kalinowski, Robert E. Cooper and James R. Martin, Gibson, Dunn & Crutcher, Los Angeles, Cal., of counsel), for defendant Chas. Pfizer & Co., Inc.

Samuel W. Murphy, Jr., New York City (Kenneth N. Hart and Richard Y. Holcomb, Donovan, Leisure, Newton & Irvine, New York City, of counsel), for defendant American Cyanamid Co.

Merrell E. Clark, Jr., New York City (Richard A. Horgan and Stuart M. Reynolds, Jr., Winthrop, Stimson, Putnam & Roberts, New York City, of counsel), for defendant Bristol-Myers Co.

CANNELLA, District Judge.

The motion for acquittal made by each defendant as to each count of the indictment, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, is granted. Each defendant is acquitted on each count of the indictment in all respects.

This criminal antitrust prosecution was commenced by the filing of an indictment on August 17, 1961. The indictment charges that the defendants, Chas. Pfizer & Co., Inc. (Pfizer), American Cyanamid Company (Cyanamid) and Bristol-Myers Company (Bristol) and the co-conspirators, Olin Mathieson Chemical Corporation (Squibb) and the Upjohn Company (Upjohn) violated sections one and two of the Sherman Act, 15 U.S.C. §§ 1 and 2,[1] by virtue of their manufacture, use and sale of the broad spectrum antibiotic drug tetracycline.[2]

## PROCEDURAL HISTORY

These defendants were first tried before a jury in October-December 1967. The jury found each defendant guilty under every applicable count of the indictment on December 29, 1967.[3] The Court of Appeals reversed their convictions and remanded the case for a new trial. United States v. Chas. Pfizer & Co., 426 F.2d 32 (2 Cir. 1970), modified and petition for rehearing en banc denied, 437 F.2d 957 (2 Cir. 1970). An equally divided Supreme Court affirmed the Court of Appeals, 404 U.S. 548 (1972) (three justices not participating). The case was, thereafter, remanded to this court for all purposes by the Court of Appeals. The parties stipulated to a nonjury trial before the court.[4]

## THE CHARGES

Each defendant is charged in three counts with having violated the Sherman Act during the years 1953–1961 by: (1) count one—conspiring to exclude competitors and fix and maintain prices in the broad spectrum antibiotic market in violation of section 1 of the Act; (2) count two—conspiring to monopolize;

---

1. Sections one and two of the Sherman Act, 15 U.S.C. §§ 1 and 2, provide, in pertinent part, as follows:

   § 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal . . . .

   § 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, · shall be deemed guilty of a misdemeanor, and on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

2. Three individual defendants were also named in the indictment. The charges against them were subsequently dismissed on the ground that they had received immunity from prosecution by virtue of their testimony before a grand jury in another district. United States v. Chas. Pfizer & Co., 245 F. Supp. 801 (S.D.N.Y.1965).

3. A subsequent motion for a judgment of acquittal notwithstanding the verdict or for new trial was denied by Judge Frankel. United States v. Chas. Pfizer & Co., 281 F. Supp. 837 (S.D.N.Y.1968)

4. The new trial was based on the record of the first trial together with certain new evidence indicated by the Court of Appeals opinion. The trial was commenced on April 2, 1973 and concluded on April 4, 1973. Post trial briefs were submitted to the court in July 1973.

and (3) count three—monopolization of the broad spectrum antibiotic market, both in violation of section 2 of the Act. The terms of the conspiracy charged in counts one and two of the indictment are as follows:

(a) The manufacture of tetracycline be confined to Pfizer, Cyanamid and Bristol;

(b) The sale of tetracyline products be confined to Pfizer, Cyanamid, Bristol, Upjohn and Squibb;

(c) The sale of bulk tetracycline be confined to Bristol and bulk tetracycline be sold by Bristol only to Uphohn and Squibb, and

(d) The sale of broad spectrum antibiotic products by the defendant companies and the co-conspirator companies be at substantially identical and non-competitive prices.[5]

The Indictment sets forth twelve "means and methods" by which the defendants are alleged to have accomplished the illegal acts specified:

(a) Cyanamid licensed Pfizer and Bristol to use its Aureomycin patent in the manufacture of Tetracycline and refused to license all other applicants.

(b) Pfizer licensed Cyanimid and Bristol under its Tetracyline patent and refused to license all other applicants.

(c) Cyanamid assisted and cooperated with Pfizer in obtaining for Pfizer a patent on Tetracycline.

(d) Pfizer, Cyanamid and Bristol suppressed litigation involving the validity of Pfizer's Tetracycline patent.

(e) Pfizer and Cyanamid and Bristol withheld pertinent and material information from the Patent Office and otherwise misled the Patent Office prior to the issuance of Pfizer's Tetracycline patent.

(f) Cyanamid acquired the competing Heyden patent application on Tetracycline and abandoned the product claims therein.

(g) Bristol sold bulk Tetracycline only to Upjohn and Squibb. Each of the defendant companies refused to sell bulk Tetracycline to all others except that Cyanamid sold a large amount of bulk Tetracycline to Pfizer in early 1954 in assisting Pfizer to make a prompt entry into the Tetracycline product market.

(h) Bristol entered into agreements with Upjohn and Squibb respectively which required Upjohn and Squibb to purchase all their requirement of bulk Tetracycline from Bristol.

(i) Pfizer issued licenses to Upjohn and Squibb, respectively, limited, however, at Bristol's request, to the sale of Tetracycline products.

(j) Pfizer and Cyanamid maintained substantially identical, non-competitive and unreasonably high prices on Terramycin products and Aureomycin products, respectively.

(k) Pfizer, Cyanamid, Bristol, Upjohn and Squibb each introduced its Tetracycline products on the market at prices which were substantially identical with each other and which conformed to the non-competitive prices of Terramycin Products and Aureomycin products in effect as of November 1953, and all these companies maintained such substantially identical, non-competitive and unreasonably high prices until at least July 1960.

(l) Pfizer, Cyanamid, Bristol, Upjohn and Squibb each introduced its Tetracycline products on the market in dosage forms and customer classifications substantially identical with the Terramycin product and Aureomycin product dosage forms and customer classifications in effect as of November 1953, and have continued to use such substantially identical dosage forms and classifications to date.[6]

These "means and methods" form the essence of the government's case and outline its position at trial.

---

5. Indictment, ¶45.

6. Id., ¶46.

## FACTUAL FRAMEWORK AND CONTENTIONS OF THE PARTIES

Although the court is not required to make specific findings of fact and conclusions of law it will do so to the extent indicated below.[7] The historical and factual framework surrounding the government charges against these defendants is deemed necessary to place the court's decision in proper perspective. In so doing, the court is mindful, as was the Court of Appeals,[8] that the twelve thousand page record in this case "is impossible to condense . . . except in a highly selective manner, and then, only by concentrating on the determinative facts." Pfizer, *supra*, 426 F.2d at 34. The court is in complete agreement with Judge Moore's statement and will proceed in like fashion.

These criminal charges arise out of the defendants' and co-conspirators' production and marketing of the broad spectrum antibiotic drug (or "wonder drug") tetracycline, from 1953 until August, 1961.

### Pre-tetracycline

Three effective, patented broad spectrum antibiotics were produced and marketed prior to the discovery of tetracycline in 1952: aureomycin, terramycin and chloromycetin. Aureomycin was first made available to the public in September 1948 by Cyanamid, who later obtained a patent for the drug in September 1949. Terramycin, the Pfizer product, was first marketed in March 1950 and was patented in July of that year. Chloromycetin was released in January 1949 and was patented in October 1949 by Parke-Davis, a pharmaceutical manufacturer not charged herein. During the pre-tetracycline period none of these manufacturers granted licenses or cross-licenses for these patented drugs. (No licenses or cross-licenses for these drugs have been subsequently granted, except to the extent indicated herein.)

Each of these antibiotics are prescription drugs, available only on a doctor's prescription and their sales, therefore, are largely dependent upon the physician's opinion of their effectiveness in treating the specific patient involved, despite their interchangeability due to chemical and functional similarities. Each manufacturer, cognizant of this, sought to price his drug, at a level which was competitive with the price fixed by the other two producers, thereby creating a stable and parallel price structure in the broad spectrum antibiotic market during the pre-tetracycline period. Price reductions by one manufacturer were met by all others during these years. Neither this price parallelism nor the companies' refusal to grant licenses for these earlier drugs is relied on by the government to support the charges of the indictment.

### Tetracycline

In June 1952, a Pfizer scientist, Dr. Conover, discovered tetracycline through the application of a deschlorination process to aureomycin. Tetracycline was considered by some to be a product superior to the earlier broad spectrum antibiotics and Pfizer filed an application for a product and process patent in October 1952. The publicity surrounding the Pfizer discovery led Cyanamid to apply for a similar patent in March 1953. The entry of these competing claims caused the Patent Office to declare an interference (the first interference) on December 23, 1953.

This turn of events placed Pfizer in a difficult position. On the one hand,

---

7. Rule 23(c) of the Federal Rules of Criminal Procedure provides:

   In a case tried without a jury the court shall make a general finding and shall in addition on request find the facts specifically. If an opinion or memorandum of decision is filed, it will be sufficient if findings of fact appear therein.

   No request for specific findings has been made by the parties, however, the court makes the findings of fact and conclusions of law contained herein.

8. The court has before it the same record as was before the Court of Appeals, supplemented by little additional evidence which was indicated to be necessary by that court's opinion.

Pfizer believed that it possessed priority of invention (June 1952, as opposed to March 1953). On the other hand, if it were awarded the tetracycline patent, Pfizer's sole method of tetracycline production would be through the application of a deschlorination process to Cyanamid's patented aureomycin, thereby making it wholly dependent upon Cyanamid for bulk aureomycin, either by purchase or license to manufacture. In an attempt to resolve both the pending interference and the potential patent block, Pfizer's President, McKeen, met with Malcolm, President of Cyanamid's Lederle Laboratories in November 1953. These McKeen-Malcolm meetings, and not any antecedent event, mark the inception of the alleged conspiracy to violate the Sherman Act charged herein, according to the government's theory of the case.

In November 1953 two Pfizer-Cyanamid meetings were held. The first, preliminary in nature, was attended by only McKeen and Malcolm. The second, attended by McKeen, Malcolm, Powers, a Pfizer vice-president, and Martin, a vice-president of Cyanamid, resulted in a written agreement, which was subsequently executed on January 11, 1954.

The government relies upon the testimony of the four individuals present at either the first or second meeting to develop what transpired at those times. All four agree that the subject under discussion was the pending Patent Office interference and the hollowness of a Pfizer victory in that proceeding unless such a victory was coupled with access to substantial quantities of aureomycin. Similarly, they agree that Cyanamid was concerned over a potential patent block to its tetracycline production, if Pfizer's Conover application ultimately prevailed. All of the participants testified that the agreement which emerged from these meetings and which settled the pending interference was a product of independent business judgment exercised in pursuit of their respective corporate interests. This agreement, formally executed on January 11, 1954, provided in sub-

stance: (1) that the parties exchange proof of priority and that the prevailing party grant a non-exclusive license to the other in consideration of a fixed royalty, (2) that Cyanamid grant Pfizer a non-exclusive license to produce aureomycin for use in tetracycline production and supply Pfizer with certain technical information, and (3) that Cyanamid sell to Pfizer a large initial quantity of bulk tetracycline, so that Pfizer could rapidly enter the tetracycline market. As the result of this agreement, proof of priority was subsequently exchanged between the parties and Cyanamid filed a concession of priority in Pfizer's favor with the Patent Office on February 4, 1954.

The government does not contend that the foregoing agreement is unlawful *per se*. Rather, the government views the Pfizer-Cyanamid meetings of 1953 and the resulting agreement as initial evidence of the conspiracy charged in the indictment and that this evidence, viewed together with the subsequent factual developments, supports a conviction in this case. The record, which is fully developed by extensive direct and cross examination, does not reveal that any discussion of prices, price fixing, exclusion of competitors or licensing restrictions occurred at the November meetings and the individuals present have vigorously denied any illegal motive for their conduct. The testimony given stresses the business reasons for the actions taken and the actors exercise of business judgment as free agents, and not as conspirators.

Bristol, the third defendant herein, was not dormant in the tetracycline field during the pendency of the Pfizer and Cyanamid applications. It developed a fermentation process for tetracycline production and applied for a process patent in October 1953. The Patent Office rejected this claim on December 8, 1953 and Bristol subsequently filed a second application asserting the separate patentability of tetracycline hydrochloride. This claim resulted in the declaration of another interference by the Patent Office in March 1954, to which Bris-

tol, Pfizer and Cyanamid were parties (the second interference).

As was stated earlier, Cyanamid conceded priority of invention to Pfizer in February, 1954, thereby increasing the likelihood that Pfizer would soon be issued the tetracycline patent. In that same month, a trade paper published a report that upon receipt of the patent, Pfizer would license no one, other than Cyanamid, to manufacture, use or sell the drug. Both of these events caused concern at Bristol, and Bristol, facing total exclusion from the tetracycline market, entered into communications with Pfizer. McKeen confirmed Pfizer's policy to license Cyanamid and no one else and he indicated that, upon receipt of the patent, Pfizer would bring infringement actions to enforce its rights. Despite these foreboding signs, Bristol, in mid-1954, entered into agreements with both Squibb and Upjohn under which Bristol was to sell bulk tetracycline to Squibb and Upjohn for resale under their own brand names and pursuant to which Squibb and Upjohn agreed to indemnify Bristol against any loss occasioned by an infringement action involving tetracycline.

Pfizer was issued the tetracycline patent on January 11, 1955. This came about after the Patent Office dissolved the second interference and denied all patent claims for tetracycline on the ground of obviousness. Pfizer, however, was able to have its claim returned to ex parte status, and then, after further studies, reports and argument, succeeded in convincing the patent examiner of its patentability. This proceeding, in which Pfizer, Bristol and Cyanamid participated and during which one Harvey Edelblute, a Cyanamid patent representative, made certain statements, is cited by the government as evidence of the conspiracy between Pfizer and Cyanamid to secure the patent for Pfizer and commit the crimes charged, notwithstanding vigorous denials by the parties and individuals involved.[9]

On the day the patent was issued, Pfizer commenced patent infringement actions against Bristol, Squibb and Upjohn. In response, Bristol, Squibb and Upjohn commenced independent actions seeking a declaratory judgment invalidating the Pfizer patent. Pfizer interposed counterclaims totaling $51,000,000 to the latter suit.

During the pendency of these law suits, Upjohn attempted to negotiate an independent settlement with Pfizer. These efforts were unavailing, however, Bristol, faced with the loss of its two largest customers, became most anxious to reach an early accord with Pfizer. These events prompted Bristol to renegotiate its agreement with Squibb and Upjohn in November 1955. The indemnity provisions of the original agreement were reversed, Bristol became the indemnitor. In return, Squibb and Upjohn yielded full control of the litigation to Bristol and promised not to enter into separate settlements with Pfizer. Squibb and Upjohn also agreed to purchase all tetracycline requirements from Bristol during the pendency of these law suits and for three years thereafter. The agreement further provided that if Bristol achieved a settlement within six months which secured direct licenses under the Pfizer patent for Squibb and Upjohn, they would bear one half of the accrued damages for the infringement and one half of the future royalties; these licenses could be limited however, to the purchase, use and sale (thereby excluding the manufacture), of tetracycline.

9. The government has laid heavy emphasis on the fraud on the Patent Office aspect of this case, asserting that it demonstrates an agreement or conspiracy between Pfizer and Cyanamid to commit the crimes charged. The court has carefully reviewed this evidence and finds it to be of limited relevance to this case. The court has concluded that this evidence fails to support an inference that Pfizer and Cyanamid had entered into agreements to fix prices or to exclude others, and therefore, in compliance with the mandate of the Court of Appeals, 426 F.2d at 41, does not attribute any substantial weight to this proof in reaching its decision in this case.

From the outset, Pfizer maintained a policy against licensing others to produce tetracycline. This approach paralleled the non-licensing policy adhered to by the manufacturers of the three pre-tetracycline broad spectrum antibiotics. The infringement actions against Bristol, Squibb and Upjohn can be said to demonstrate this approach. This policy was first abrogated to resolve the Pfizer-Cyanamid patent block, discussed earlier, but was otherwise enforced throughout this period until the "Broady incident."

John G. Broady, a lawyer-investigator, was tried in the New York state courts in November-December 1955 and convicted of wire-tapping numerous telephones, including those of Bristol and Squibb. The proof adduced at trial indicated that Broady had been retained by Pfizer's general counsel to make certain investigations and that his illegal actions stemmed therefrom. Bristol advantageously seized upon this Broady material by asserting that it would exploit the incident in its defense of the infringement suit. Pfizer, fearful that the adverse publicity created by such disclosure would damage its reputation, quickly arranged a meeting between McKeen and Schwartz, President of Bristol, to discuss the possibilities of a settlement.

The Pfizer-Bristol meetings took place on December 14 and 15, 1955 and were attended by McKeen, Schwartz and their respective patent counsel. The government contends that as a result of these meetings Bristol was brought into the alleged conspiracy for the first time.

The Pfizer-Bristol meetings resulted in a settlement of the pending litigation. A formal agreement embodying the agreed upon terms was executed on March 25, 1956 and provided that: (1) Pfizer grant Bristol a non-exclusive license to make, use and sell tetracycline in consideration of a 3½ percent royalty; (2) Pfizer grant Squibb and Upjohn a non-exclusive license to purchase, use and compound tetracycline and sell tetracycline to the drug trade, also in consideration of a 3½ percent royalty; (3) Bristol, Squibb and Upjohn pay Pfizer $600,000 in accrued royalties for prior infringing sales; and (4) all pending law suits between the parties involving tetracycline be dismissed without prejudice.

The government contends that Bristol's entry into the alleged conspiracy occurred during the meetings of December 1955 and that the agreement reached was a product of conspiratorial conduct, although the legality of the agreement itself is not challenged. The government does not question the propriety of Bristol's conduct antecedent to these meetings, despite the close parallels in Bristol's actions both before and after December, 1955. The government places stress on the limited nature of the licenses granted to Squibb and Upjohn, asserting that this evidences the crimes charged and Bristol's participation therein. In derogation of these charges, both McKeen and Schwartz have testified that the agreement was in all respects the product of sound business judgment that in no way involved actions of a conspiratorial nature.

The facts set out above are not, in the main, substantially in dispute. It is not disputed that throughout the period covered by the indictment the defendants and co-conspirators maintained substantially similar and parallel prices on tetracycline in the retail, wholesale and private hospital markets and that the only price deviations between them occurred in instances of competitive bidding.[10]

10. The prices charged by the defendants and co-conspirators during this period are based on suggested list prices which were discounted in order to arrive at the actual prices charged to the various purchasers. The discount structure was as follows: (1) Retailer, 40% off list; (2) Private Hospital, 40% off list; (3) Wholesaler, 40% off list reduced by an additional 16⅔% and then further reduced by 5% (Pfizer's discount was 40% plus 20% off list, Squibb's was 40% plus 16% and Upjohn did not sell to wholesalers). After discounting, the published (actual) prices for each available broad

Nor is it disputed that only the five firms named in the indictment manufactured or sold tetracycline on the domestic market, to the exclusion of all others. Rather, the question in this case is whether the government has shown, by proof adduced at trial, that the defendants and co-conspirators agreed or conspired to fix or maintain prices, to exclude competitors and to monopolize the tetracycline market or achieved monopolization of that market by virtue of their conspiratorial conduct or whether the facts demonstrate nothing more than the natural and normal consequences of the exercise of independent business judgment and the free-flow of marketplace forces.

## THE WEIGHT AND SUFFICIENCY OF THE EVIDENCE

■ The *sine qua non* of the charges against these defendants is proof of an agreement or conspiracy to engage in the illegal acts of which they stand accused. Such agreement need not be in writing or formalized in other fashion. United States v. Masonite Corp., 316 U. S. 265, 275, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942); Krulewitch v. United States, 336 U.S. 440, 452, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J., concurring); American Tobacco Co. v. United States, 147 F.2d 93, 107 (6 Cir.), affirmed 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). The behavior and conduct of the alleged conspirators may sufficiently evidence the existence of a tacit agreement or conspiracy to commit the illegal acts. United States v. Paramount Pictures, 334 U.S. 131, 142, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); American Tobacco, *supra,* 328 U.S. 781, 809–810, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); Bausch Machine Tool Co. v. Aluminum Company of America, 72 F.2d 236, 241 (2 Cir. 1934). The facts and circumstances of the case as a whole may be employed to prove the conduct necessary to sustain a conviction. United States v. Singer Mfg. Co., 374 U.S. 174, 190, n. 7, 83 S.Ct. 1773, 10 L.Ed.2d 823 (1963), American Tobacco, *supra,* 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575. Indeed, for the purposes of this case, the court accepts the government's statement of the law applicable to the count one conspiracy.

In order to establish the crime charged here it is only necessary that a conspiracy or agreement or understanding be established. The Government is not required to prove that the defendants or any of them specifically intended to violate the law or specifically intended to restrain interstate commerce. The law presumes that persons intended the necessary and direct consequences of their acts.[11]

■■ The law governing count two, the conspiracy to monopolize, is in substance the same as that set out above, with an additional necessary element– proof of specific intent to monopolize. United States v. Consolidated Laundries Corp., 291 F.2d 563, 573 (2 Cir. 1961). *See also,* Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 626, 73 S. Ct. 872, 97 L.Ed. 1277 (1953); Woods Exploration & Producing Co. v. Aluminum Co. of America, 438 F.2d 1286, 1304 (5 Cir.), cert. denied, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1971); Lewis v. Pennington, 400 F.2d 806 (6 Cir.), cert. denied, 393 U.S. 983, 89 S.Ct. 450, 21 L.Ed.2d 444 (1968); American Football League v. National Football League, 323 F.2d 124, 132 (4 Cir. 1963). The monopolization count of the indictment, count three, requires proof of monopoly power in the relevant market plus either proof of a combination or conspiracy to monopolize (proof of count two would suffice) or proof of

---

spectrum antibiotic, 250 milligram capsules in bottles of 100, during this period were:

| | |
|---|---|
| List Price | $51.00 |
| Retail | 30.60 |
| Private Hospital | 30.60 |
| Wholesale | 24.22 * |

* Upjohn did not sell to wholesalers. Squibb's price to wholesalers was $25.70 and Pfizer's $24.48.

11. Government's Brief, p. 92.

other purposeful and intentional acts going to the acquisition, maintenance or exercise of the monopoly power. *See*, American Tobacco, *supra*, 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575; United States v. Aluminum Company of America, 148 F.2d 416 (2 Cir. 1945).

■ The government has sought to prove the various elements of the crimes charged herein by means of circumstantial evidence and attempts to predicate a finding of guilt upon the inferences arising therefrom. The Court of Appeals has recognized circumstantial proof as proper evidence in this case, Pfizer, *supra* 437 F.2d at 958, and the rule is clear that such circumstantial evidence need not preclude every reasonable hypothesis of innocence in order to support a conviction, if the prosecution otherwise meets its burden of proof. Holland v. United States, 348 U.S. 121, 139–140, 75 S.Ct. 127, 99 L.Ed. 150 (1954); United States v. Aadal, 368 F. 2d 962, 964 (2 Cir.), cert. denied, 386 U.S. 970, 87 S.Ct. 1161, 18 L.Ed.2d 130 (1967).

In the face of the government's circumstantial proof and argument, stands the defendants' vigorous and complete denials of the existence of any agreement or conspiracy to engage in the illegal acts charged in the indictment. The defendants assert that their conduct and the consequences flowing therefrom were the natural results of independently exercised business judgment and not the product of any illegal conspiracy. They urge that the proof demonstrates nothing more than "conscious parallelism" and similarity of business practices, neither of which are illegal standing alone. Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 540–541, 74 S.Ct. 257, 98 L.Ed. 273 (1954); United States v. International Harvester Co., 274 U.S. 693, 708–709, 47 S.Ct. 748, 71 L.Ed. 1302 (1927); Independent Iron Works, Inc. v. United States Steel Corp., 322 F.2d 656, 661 (9 Cir.), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963).

The court, faced with a case that presents neither substantially disputed facts nor turns upon questions addressed to the applicable law but, rather, revolves around the possible interpretations emanating from the proof, finds guidance for the decisional process in Judge Medina's statement in the *Investment Bankers'* case, United States v. Morgan, 118 F.Supp. 621, 634 (S.D.N. Y. 1953).

True it is that conspiracies whether by business men or others engaged in unlawful schemes are often hard to detect. No direct proof of agreement between the wrongdoers is necessary; circumstantial evidence of the illegal combination is here as elsewhere often most convincing and satisfactory. But, when all is said and done, it is the true and ultimate fact which must prevail. Either there is some agreement, combination or conspiracy or there is not. The answer must not be found in some crystal ball or vaguely sensed by some process of intuition, based upon a chance phrase used here or there, but in *the evidence adduced in the record of the case which must be carefully sifted, weighed and considered in its every aspect.* This is an arduous but necessary task. (emphasis added)

■ After a thorough evaluation of the evidence, the court must determine whether the government has produced a quantum of proof sufficient to sustain a criminal conviction. The prosecution can prevail only if it has introduced credible evidence that convinces the court, sitting as trier of the facts, of the defendants' guilt beyond a reasonable doubt. The reasonable doubt standard is a constitutional precept in criminal prosecutions. In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.

■ The standard is best defined as "such a doubt as would cause prudent men to hesitate before acting in matters of importance to themselves" and the court employs this formulation of reasonable doubt here. United States v. Johnson, 343 F.2d 5, 6 (2 Cir. 1965). *See also*, Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954); United States v. Hart, 407 F.2d 1087, 1091 (2 Cir. 1969); United States v. Bilotti, 380 F.2d 649, 654 (2 Cir. 1967); United States v. Nuccio, 373 F.2d 168, 175 (2 Cir. 1967).

## CONCLUSION

■ After a careful and laborious review of all of the evidence in this case the court finds that the government has failed to meet its burden of proof. The court is not convinced beyond a reasonable doubt that the defendants are guilty of the crimes of which they stand accused. The court is not persuaded beyond the "hesitation point" that the defendants Pfizer and Cyanamid engaged in anything other than the exercise of independent business judgment when they entered into the January 11, 1954 agreement that settled the patent block situation. The court is of a similar opinion with regard to the Bristol-Pfizer agreement that terminated the infringement suits in March 1956. The leverage Bristol gained from the "Broady" incident and not any secretive transaction best explains the impetus for this settlement. The parallel pricing among the tetracycline producers, standing alone, does not indicate price fixing,[12] and the court finds the parallel and substantially similar price structure maintained by Parke-Davis[13] and the absence of any provable agreement between the defendants are together sufficient to cast doubt upon an inference of ilegality. The court is not convinced that the illegal conduct alleged here is demonstrated by the "Patent Office" or "excess profits" evidence[14] offered by the government. In short, the court finds that the government has not proved the requisite elements of the crimes charged beyond a reasonable doubt.

■ In United States v. Buchalter, 88 F.2d 625, 626 (2 Cir.) cert. denied, 301 U.S. 708, 57 S.Ct. 942, 81 L.Ed. 1362 (1937), Judge Chase stated:

Difficulty of proof is no substitute for actuality of proof and an accused is presumed to be innocent until proved guilty as charged beyond a reasonable doubt. Here there were, indeed, many suspicious circumstances to lead to the conclusion that [the defendant] was guilty, but there was no substantial evidence to overcome the presumption of innocence. . . .

Nothing this court might now say could better summarize the rationale of its opinion in the instant case. The burden of proving the defendants' guilt beyond a reasonable doubt is a heavy one; it has not been met in this case.

12. The fact that tetracycline is a prescription drug and therefore, is largely dependent upon physicians' recommendations for its sales volume is significant to the pricing policies that emerged during the period in question. The defendants assert that the market structure for tetracycline and tetracycline products during these years followed that of the pre-tetracycline broad spectrum antibiotics, (the legality of which has not been questioned), see discussion p. 95, *supra*, and the court agrees with this construction.

13. The pricing policies of Parke-Davis, a competitor of the defendants not charged in the indictment, was largely excluded at the first trial. The Court of Appeals found this evidence most significant on the question of whether or not a conspiracy did in fact exist and premised its reversal, in large part, upon the restriction placed upon the use of this proof by the first trial judge. This court has followed the mandate of the Court of Appeals and has carefully considered the Parke-Davis evidence. The court concludes that this evidence is entitled to substantial weight and bears heavily against a verdict of guilty in this case. *See, Pfizer supra*, 426 F.2d at 43–45.

14. This court is not convinced that excess profits demonstrate guilt any more than nominal profits would prove innocence of a price-fixing charge.

The motions for acquittal made by all defendants as to all counts of the indictment are granted. The Clerk of this Court is directed to enter judgment dismissing the indictment.

So ordered.