The STATE OF NORTH CAROLINA, Appellant,

v.

CHAS. PFIZER & CO., INC., et al., Appellees.

No. 74–2154.

United States Court of Appeals, Fourth Circuit.

Argued June 10, 1975.

Decided Jan. 12, 1976.

Jean A. Benoy, Deputy Atty. Gen. of N. C. (Rufus L. Edmisten, Atty. Gen. of N. C., John M. Silverstein, Asst. Atty. Gen. of N. C., Noel L. Allen and David S. Crump, Associate Attys. Gen., N. C. Dept. of Justice, on brief), for appellant.

Robert E. Cooper, Los Angeles, Cal. (John J. Geraghty, David W. Long, Raleigh, N. C., Julian O. von Kalinowski, Don J. Belcher, James R. Martin, Gibson, Dunn & Crutcher, Los Angeles, Cal., Poyner, Geraghty, Hartsfield & Townsend, Raleigh, N. C., on brief), for appellee Chas. Pfizer and Co., Inc.

Merrell E. Clark, Jr., New York City (Joseph C. Moore, Jr., Young, Moore & Henderson, Raleigh, N. C., Winthrop, Stimson, Putnam & Roberts, Fish & Neave, New York City, on brief), for appellee Bristol-Myers Co.

Roberts B. Owen, Washington, D. C. (Charles E. Buffon, Washington, D. C., Joseph C. Moore, Jr., Joseph W. Yates III, Raleigh, N. C., Covington & Burling, Washington, D. C., Young, Moore & Henderson, Raleigh, N. C., on brief), for appellee The Upjohn Co.

Allen F. Maulsby, New York City (Joseph C. Moore, Jr., Richard M. Hirsch, New York City, Young, Moore & Henderson, Raleigh, N. C., Cravath, Swaine & Moore, New York City, on brief), for appellee Olin Mathieson Chemical Corp.

Samuel W. Murphy, Jr., New York City (Kenneth N. Hart, New York City, Richard Y. Holcomb, Howard E. Manning, Raleigh, N. C., Steven M. Hayes, Donovan, Leisure, Newton & Irvine, New York City, Manning, Fulton & Skinner, Raleigh, N. C., on brief), for appellee American Cyanamid Co.

Before RUSSELL, FIELD and WIDENER, Circuit Judges.

FIELD, Circuit Judge:

Alleging violations of sections 1 and 2 of the Sherman Act, the State of North Carolina instituted this action for damages on behalf of itself, its governmental subdivisions and all citizen consumers who had purchased broad-spectrum antibiotics manufactured and sold by the defendants in North Carolina during the period 1952 to 1966. The defendants are Chas. Pfizer & Co., Inc. (Pfizer), American Cyanamid Company (Cyanamid), Bristol-Myers (Bristol), Olin-Mathieson Chemical Corporation (Squibb), and The Upjohn Company (Upjohn).

The thrust of the plaintiff's case is that Pfizer, aided by Cyanamid, obtained the Conover patent [1] on the antibiotic, tetracycline, by conduct which amounted to a fraud on the Patent Office and thereafter, in combination with the other defendants, exploited it for the purposes of restraining and monopolizing trade and commerce in the broad-spectrum antibiotic market and particularly the tetracycline market.[1a] The case was tried to the court without a jury, and after an extended trial the district judge filed an opinion containing his findings of fact and conclusions of law.[2] The court concluded that the plaintiff had failed to establish that the defendants had violated the Sherman Act, or that Pfizer was guilty of fraudulent procurement or misuse of the Conover patent. Accordingly, judgment was entered in favor of the defendants and North Carolina has appealed.

North Carolina's appeal presents two issues: (1) Whether the district court erred as a matter of law when it denied the plaintiff's motion for partial summary judgment on the basis of collateral estoppel that Pfizer and Cyanamid had caused the Conover patent to be issued by defrauding the United States Patent Office; and (2) whether the district court's findings of fact were clearly erroneous.

The Conover patent has been involved, either directly or indirectly, in extensive litigation commencing with a proceeding before the Federal Trade Commission (Commission) in 1958, and the background of the present controversy has been chronicled in a number of decisions.[3] The relevant facts developed in the district court are as follows. Prior to 1952 three effective and patented broad-spectrum antibiot-

---

1. Tetracycline was first identified by Dr. Conover, a Pfizer chemist, and an application for a patent on tetracycline and the production process was filed by Pfizer on behalf of Dr. Conover on October 23, 1952. The patent, carrying No. 2,699,054, is generally referred to as the Conover patent.

1a. See *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).

2. *State of North Carolina v. Chas. Pfizer & Co., Inc.*, 384 F.Supp. 265 (E.D.N.C.1974).

3. The reported cases are as follows:
 *United States v. Chas. Pfizer & Co., Inc., et al.*, 245 F.Supp. 801 (S.D.N.Y.1965).

*American Cyanamid Co. v. F. T. C.*, 363 F.2d 757 (6 Cir. 1966).

*Chas. Pfizer & Co., Inc. v. F. T. C.*, 401 F.2d 574 (6 Cir. 1968), *cert. denied*, 394 U.S. 920, 89 S.Ct. 1195, 22 L.Ed.2d 453.

*United States v. Chas. Pfizer & Co., Inc.*, 217 F.Supp. 199 (S.D.N.Y.1963).

*United States v. Chas. Pfizer & Co.*, 281 F.Supp. 837 (S.D.N.Y.1968).

*United States v. Chas. Pfizer & Co.*, 426 F.2d 32 (2 Cir. 1970), *reh. den.*, 437 F.2d 957, *cert. granted*, 402 U.S. 942, 91 S.Ct. 1617, 29 L.Ed.2d 110, *aff'd*, 404 U.S. 548, 92 S.Ct. 731, 30 L.Ed.2d 721.

*United States v. Chas. Pfizer & Co., Inc.*, 367 F.Supp. 91 (S.D.N.Y.1973).

ics were produced and marketed. They were Aureomycin which was produced by Cyanamid and was covered by the Duggar patent, U.S. Patent No. 2,482,055 and the Niedercorn patent, U.S. Patent No. 2,609,329; Terramycin which was produced by Pfizer and was covered by the Sobin patent, U.S. Patent No. 2,516,080; and Chloromycetin which was patented and produced by Parke-Davis. Parke-Davis is not a party to the present litigation. None of these three manufacturers granted licenses or cross-licenses for these particular drugs. Each of the antibiotics are prescription drugs and their sales are largely dependent upon the physician's opinion of their effectiveness. Since they have a high degree of interchangeability, each manufacturer priced his drugs at a level competitive with the other two producers, thereby creating a stable and parallel price structure, and price reductions by one manufacturer were met by the others during these years.

Prior to 1952, neither the molecular structure of Terramycin nor that of Aureomycin was known, and Dr. Conover, a Pfizer scientist, was a member of a research team which was seeking to determine the structure of Pfizer's Terramycin. In the spring of 1952 the Pfizer team succeeded in ascertaining the structures of both Terramycin and Aureomycin. Shortly thereafter, Dr. Conover discovered that another antibiotic, tetracycline, could be produced by the application of a deschlorination process to Aureomycin. Pfizer filed the Conover application for a product and process patent on tetracycline in October of 1952, and in March of 1953 Cyanamid filed its Boothe-Morton application for a similar patent. In addition to these two applications, in September of 1953 Heyden Chemical Corporation filed its Minieri application[4] for a patent on tetracycline and the fermentation process for producing it, and in October,

1953, Bristol filed a similar application under the name of Heinemann.

The competing claims of Pfizer and Cyanamid resulted in the declaration of an interference by Herbert J. Lidoff, the Patent Examiner, in December of 1953. While Pfizer believed that it possessed priority of invention, it was aware that its sole method of tetracycline production depended upon the application of the deschlorination process to Cyanamid's patented Aureomycin thereby making it wholly dependent upon Cyanamid for its supply of bulk Aureomycin. In an attempt to resolve the question, representatives of the two companies worked out an agreement providing (1) that the parties would exchange proof of priority and that the prevailing party would grant a nonexclusive license to the other in consideration of a fixed royalty; (2) that Cyanamid would grant Pfizer a nonexclusive license to produce Aureomycin for use in tetracycline production; and (3) that Cyanamid would sell to Pfizer an initial quantity of bulk tetracycline so that Pfizer might immediately enter the tetracycline market. After an exchange of proofs relative to the discovery Cyanamid conceded priority to Pfizer and, upon this concession, the Patent Office terminated the interference.

In the meantime, Bristol continued the prosecution of its Heinemann application, and in March of 1954 the Examiner declared a second interference between the Heinemann, Conover and Cyanamid's Minieri applications. The interference proceeding continued until October 14, 1954, on which date the Examiner dissolved the interference, primarily on the ground that tetracycline was unpatentable over the prior art as disclosed in Cyanamid's Duggar and Niedercorn patents because tetracycline, as well as Aureomycin, appeared to be co-produced in fermentation processes disclosed by those two prior patents. There-

4. Shortly after the filing of the Minieri application, Heyden negotiated the sale of its Antibiotic Division to Cyanamid and on December 1, 1953, Cyanamid took over the assets of Heyden's Antibiotic Division, including the Minieri patent application. Thereafter, Cyanamid abandoned the product claims of the Minieri application but continued to prosecute the process claims. A patent on the Minieri process claim was issued to Cyanamid in February, 1956.

after, in November of 1954 the Examiner issued rejections on all of the claims in the Conover, Minieri and Heinemann applications. Following this dissolution of the second interference Pfizer continued the ex parte prosecution of the Conover application and endeavored to convince Examiner Lidoff that he was in error. Subsequently, Lidoff requested Pfizer to run tests on "Example 28" which was one of the forty-four samples of media contained in the Niedercorn patent. Pfizer conducted the tests to determine whether tetracycline could be recovered from "Example 28" using the recovery procedures described in the Bogert-Walsh,[5] Minieri and Heinemann applications. Based upon these tests Pfizer submitted affidavits to the Examiner, reporting that efforts to recover products clearly identifiable as tetracycline from the "Example 28" fermentation broths were unsuccessful. Following the submission of further information by Pfizer, Examiner Lidoff withdrew his previous rejection and allowed the Conover application. The patent on tetracycline and the deschlorination process was issued to Pfizer on January 11, 1955.

## I

As heretofore stated, the controversy relative to the procurement and use of the Conover patent by Pfizer first surfaced in a proceeding before the Federal Trade Commission in 1958, charging the five defendants in the present case with violations of Section 5 of the Federal Trade Commission Act, 15 U.S.C § 45.[6] The Commission's complaint alleged, among other things, that Pfizer had made false and misleading statements to the Patent Office for the purpose of inducing the issuance of the Conover patent, and that Cyanamid and Bristol had withheld material information from the Patent Office in the course of the prosecution of their patent applications. It further charged that Pfizer, Cyanamid, Bristol, Squibb and Upjohn had violated the Act by maintaining arbitrary prices through a conspiracy and combination, and by restraining and eliminating competition in the sale of antibiotics. The Hearing Examiner initially found in favor of the drug companies on all issues and dismissed the complaint. However, the Commission reversed the Hearing Examiner and determined that Pfizer and Cyanamid were guilty of a fraud on the Patent Office and that they, together with Bristol, Squibb and Upjohn, were guilty of price fixing. The Commission issued a cease and desist order with respect to price fixing and, additionally, directed Pfizer to license its tetracycline patent to any domestic applicant on a two and one-half per cent royalty basis. Under identical terms Cyanamid was directed to license its two Aureomycin patents.

The respondent companies filed a petition for review in the Court of Appeals of the Sixth Circuit.[7] After a review of the proceedings in the Patent Office incident to the prosecution of the Conover application, the court stated that "[f]undamental to the Commission's findings of improper conduct on the part of Pfizer and Cyanamid is the question [as] to what extent previous coproduction of tetracycline in aureomycin broths was material to the issuance of the patent."[8] The court noted that this involved numerous questions concerning the actions and purposes of Examiner Lidoff as representative of the Patent Office, and concluded that in the absence of his testimony the decision of the Commission on

---

**5.** The *Bogert-Walsh application* was filed by Pfizer in April of 1954 and dealt with the separation of tetracycline from chlortetracycline in fermentation broths and other aqueous solutions.

**6.** 15 U.S.C § 45(a)(1): "Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful."

15 U.S.C § 45(a)(6): "The Commission is empowered and directed to prevent persons, partnerships, or corporations * * * from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce."

**7.** *American Cyanamid Company v. F. T. C.*, 363 F.2d 757 (6 Cir. 1966).

**8.** *Id.*, at 777.

this issue was necessarily based upon inferences and speculation insufficient to constitute substantial evidence. Accordingly, the entire proceeding was remanded to the Commission for a *de novo* hearing, with directions that the Commission could consider any evidence previously taken as well as any additional evidence relevant to the issues.

Upon the remand, the proceeding was assigned to a new Hearing Examiner and the testimony of Examiner Lidoff and two witnesses for Pfizer was taken. The Hearing Examiner found that representatives of both Pfizer and Cyanamid had made false and misleading statements to the Patent Office which induced the issuance of the Conover patent, and that such conduct constituted an unfair method of competition within the meaning of the Federal Trade Commission Act. The Commission adopted the findings and conclusions of the Hearing Examiner relative to the patent issue, but dismissed the charge of price fixing by an equally divided vote. The Commission's order again required Pfizer and Cyanamid to grant non-discriminatory licenses under their patents for tetracycline and Aureomycin.

Upon petition for review the Sixth Circuit held that the Commission's findings were supported by substantial evidence and affirmed and enforced its order.[9] The court noted the sharp disagreement between Pfizer's witnesses and Examiner Lidoff with respect to the tests which had been conducted by Pfizer on Niedercorn "Example 28". Pfizer took the position before the Commission (as it did in the present litigation) that Lidoff was interested only in "appreciable" and "recoverable" amounts of tetracycline, but Lidoff testified that he did not consider either the proportion or the amount to be the significant factor. Pfizer further contended that if Lidoff was interested in mere trace amounts, he failed to convey that fact to Pfizer's representatives and, accordingly,

they were not guilty of any misrepresentation. The court held, however, that there was substantial evidence to support the conclusion of the Commission that the Patent Office records were sufficient to put both Cyanamid and Pfizer on notice that Lidoff was interested in ascertaining whether any tetracycline was inherently produced in the Aureomycin broths.[10]

The complaint in the present case was filed in January of 1969, and thereafter the parties engaged in extensive discovery proceedings which focused primarily on the patent aspect of the litigation. In July of 1973, shortly prior to trial, the plaintiff filed a motion for partial summary judgment against Pfizer and Cyanamid on the issue that the Conover patent had · been granted as a result of the false and misleading statements which had been made to Patent Examiner Lidoff. The basis for the motion was that this precise factual issue had been previously adjudicated by the Federal Trade Commission in the proceedings hereinabove set forth, and that Pfizer and Cyanamid should be collaterally estopped from relitigating the issue in the present case. In pressing its motion, the plaintiff contended that *Blonder-Tongue v. University Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), had discarded the doctrine of mutuality of estoppel, and that under *Zdanok v. Glidden Co.*, 327 F.2d 944 (2 Cir. 1964), and *United States v. United Airlines, Inc.*, 216 F.Supp. 709 (E.D.Wash. & Nev.1962), aff'd as to res judicata, sub nom., *United Airlines v. Wiener*, 335 F.2d 379 (9 Cir. 1964), it was entitled to use the Commission's decision offensively against Pfizer and Cyanamid. The district court, in denying the motion, rejected plaintiff's argument that the doctrine of collateral estoppel as recognized in *Blonder-Tongue* should be extended to cover its use offensively by an antitrust plaintiff against a patentee.

9. *Charles Pfizer & Co. v. F. T. C.*, 401 F.2d 574 (6 Cir. 1968).

10. The review statute, 15 U.S.C § 45(c), provides:

"The findings of the Commission as to the facts, if supported by evidence, shall be conclusive."

The question before the Court in *Blonder-Tongue* was whether the doctrine of mutuality of estoppel which it had applied in *Triplett v. Lowell*, 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949 (1936), was "a viable rule where a patentee seeks to relitigate the validity of a patent once a federal court has declared it to be invalid." [11] Upon the narrow issue before it the Court concluded "that *Triplett* should be overruled to the extent it forecloses a plea of estoppel by one facing a charge of infringement of a patent that has once been declared invalid." [12] Since the validity *vel non* of the Conover patent was not directly in issue in the proceedings before the Commission [13] or in the court below, the precise holding of *Blonder-Tongue* is not dispositive of the question raised by the plaintiff's motion. This is of little moment, however, since the plaintiff's motion should properly be considered in the light of the fundamental changes and developments in the doctrine of collateral estoppel which were thoroughly reviewed and analyzed by Mr. Justice White in his opinion in *Blonder-Tongue*.

The landmark case is, of course, *Bernhard v. Bank of America Nat. Trust & Savings Assn.*, 19 Cal.2d 807, 122 P.2d 892 (1942), in which Justice Traynor rejected the doctrine of mutuality and stated the criteria as follows:

"In determining the validity of a plea of res judicata three questions are pertinent: Was the issue decided in the prior adjudication identical with the one presented in the action in question? Was there a final judgment on the merits? Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?" 19 Cal.2d at 813, 122 P.2d, at 895.

In the wake of *Bernhard*, the great majority of the courts, both state and federal, elected to jettison the mutuality requirement, especially where the prior judgment was invoked defensively. This abrogation of mutuality engendered what Mr. Justice White characterized as "mutations in estoppel doctrine" which have resulted in a much more flexible application of this once narrow and restricted concept. Typical of this more liberal approach is *Eisel v. Columbia Packing Company*, 181 F.Supp. 298, 301 (D.Mass.1960), where Judge Wyzanski stated:

"where a plea of collateral estoppel is raised against a plaintiff who had a full trial in a prior action, the decisive question is not whether there is mutuality of estoppel. Nor is the decisive question whether there is technical privity between the second defendant and the first defendant. Instead of such wooden tests, inquiries should be made as to whether plaintiff had a fair opportunity procedurally, substantively and evidentially to pursue his claim the first time."

This rationale was adopted in our own circuit in *Graves v. Associated Transport, Inc.*, 344 F.2d 894, 900 (1965):

"The courts * * * have willingly inquired into the circumstances of the actual case, and time and again they have allowed the plea against a party not having the initiative in the former action whenever they have been satisfied that the party against whom the former judgment was invoked in fact had a realistically full and fair opportunity to litigate the issues in the former action."

Appraised in the light of *Eisel* and *Graves*, however, we think the plaintiff's motion was properly denied since, in our opinion, the proceeding before the Commission did not afford Pfizer and Cyanamid a "fair opportunity procedurally, substantively and evidentially" to litigate the issue raised in the present case. First of all, the case before the Commission was an admin-

11. 402 U.S. 313, at 327, 91 S.Ct. 1434, at 1442, 28 L.Ed.2d 788.

12. *Id.*, at 350, 91 S.Ct. at 1453.

13. "The Commission did not undertake to pass upon the validity of the patent, nor do we. The order of the Commission treats the patent as valid and requires compulsory licensing. The issue here is a violation of Section 5 of the Federal Trade Commission Act, not the validity of a patent." *Chas. Pfizer & Co. v. F. T. C.*, 401 F.2d 574, 586 (6 Cir. 1968).

istrative proceeding, not a judicial trial, and while the Sixth Circuit put its imprimatur upon the Commission's determination, the court, acting under the review statute, merely found that there was substantial evidence to support the Commission's conclusions. The issue before the Commission was whether the respondents in that proceeding were guilty of unfair methods of competition in violation of Section 5 of the Federal Trade Commission Act which is a regulatory statute much broader in its scope than the Clayton and Sherman Acts under which the present litigation was instituted. The Commission did not require that the alleged fraud on the Patent Office be demonstrated by clear and convincing evidence [14] and employed evidentiary and procedural rules much more lenient than those incident to a judicial trial. While we are not disposed to hold that an administrative proceeding can never be the basis for a plea of collateral estoppel, we do not think it would be appropriate to accord such effect to the Commission's Section 5 proceeding in the present case.[15] We agree with the observation of the court in *United States v. Chas. Pfizer & Co.*, 205 F.Supp. 94, 96 (S.D.N.Y.1962):

> "The legal concepts and issues are quite different. The Federal Trade Commission is regulatory in nature; the Sherman Act is penal as well as civil; the consequences flowing from each Act are quite dissimilar. The proceedings themselves, the rules governing them and the legal principles applicable to each are distinct."

Our conclusion on this point is buttressed by the fact that by the very terms of the Federal Trade Commission Act, proceedings under Section 5 appear to be incompatible with the doctrine of collateral estoppel. Section 5(e) [16] of the Act reads:

"No order of the Commission or judgment of the court to enforce the same shall in any wise relieve or absolve any person, partnership, or corporation from any liability under the Antitrust Acts."

It would be strangely unfair to permit the Government to litigate under the Sherman or Clayton Acts an issue earlier decided against it in a Section 5 proceeding, and at the same time deny to a respondent the right to defend on the same issues in a subsequent antitrust suit brought by a plaintiff who was not even a party to the administrative proceeding. We further note that Section 5(a) of the Clayton Act [17] provides, in effect, that a final judgment or decree rendered in any civil or criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated such laws shall be *prima facie* evidence against the defendant in any action or proceeding brought by any other party or the United States as to all matters respecting which such judgment or decree would be an estoppel as between the parties thereto. To us it would be paradoxical to accord a Section 5 administrative proceeding the absolute effect of collateral estoppel when a court determination in a criminal action that a defendant had violated the Sherman Act is limited to only *prima facie* effect. Accordingly, we conclude that the district court acted properly in denying the plaintiff's summary motion.

## II

 In addition to the collateral estoppel issue the plaintiff urges that the findings of the trial court on the operative issues in this case were clearly erroneous and should be set aside. We are persuaded otherwise.

---

14. The parties concede that the "clear and convincing" standard applies to this issue. *See Schnadig Corporation v. Gaines Manufacturing Co., Inc.*, 494 F.2d 383, 393 (6 Cir. 1974).

15. In support of its contention that the administrative proceeding is entitled to collateral estoppel effect, the plaintiff cites *United States v. Willard Tablet Co.*, 141 F.2d 141 (7 Cir. 1944), and *United States v. Piuma*, 40 F.Supp. 119

(S.D.Cal.1941). These cases are inapposite since they were merely statutory proceedings in each of which the court simply applied the provisions of 45 U.S.C. § 45(g) governing the finality of the Commission's orders.

16. 15 U.S.C. § 45(e).

17. 15 U.S.C. § 16(a).

On the charge of fraud all of the parties focus upon the deposition of the Patent Examiner, Lidoff, and they are in agreement that his testimony was crucial on this point.[18] Lidoff testified that if he had known that tetracycline was inherently co-produced along with Aureomycin in the practice of the Duggar and Niedercorn patents he would have rejected the Conover application. However, he candidly admitted that he could not recall what was actually said in the various interviews incident to the Conover application, and stated the basis of his testimony as follows:

"[A]nything that I say as having recalled something is really a reconstruction in my mind based on what recent review of the record I have had, which has not been in any detail. So that I cannot say that I positively recall one thing or another. But I can reconstruct what my view would have been at that time."

Upon this basis Lidoff adhered to his position that he considered the presence of any tetracycline in the experimental broths to be significant on the question of patentability. This, of course, was at variance with Pfizer's contention that Lidoff was interested only in the presence of appreciable and recoverable amounts of tetracycline.

Upon this conflict the district court found the record supportive of Pfizer's position. Among other things, an amendment filed in the Patent Office on November 29, 1954, following a meeting with Lidoff stated: "He [Lidoff] * * * is not concerned about trace amounts which can be separated from the broths by methods now recommended for recovery of the new antibiotic." The district court further noted that the presence of some tetracycline in Aureomycin broths was known by scientists at the time the Conover patent was being processed, and was disclosed by documents in patent applications which were then pending before Examiner Lidoff, including a certificate filed by Pfizer's Dr. Bogert. In

considering the probative force of Lidoff's testimony, the court also had before it the testimony of four patent experts and several patent attorneys to the effect that prior accidental and unrecognized co-production of trace amounts of tetracycline with Aureomycin would not render Pfizer's claim to tetracycline unpatentable. This testimony supported Pfizer's contention that neither its patent counsel nor Lidoff considered trace amounts of tetracycline significant. Based upon a careful review of the evidence bearing on this issue, the district judge concluded that the plaintiff had failed to establish its charge of fraud on the Patent Office, stating that, at best, it disclosed only a misunderstanding between Pfizer's representatives and Lidoff.

On the charge that the defendants had engaged in a conspiracy to exclude competition and monopolize the tetracycline market, the plaintiff placed considerable reliance upon the settlement of the patent interference between Pfizer and Cyanamid. The district court's rejection of the plaintiff's contention that this was convincing evidence of conspiratorial conduct is supported by Judge Dobie's observation in *Hutzler Bros. Co. v. Sales Affiliates, Inc.*, 164 F.2d 260 (4 Cir. 1947):

"We cannot attach, as defendants seem to suggest, any ulterior motives, or any improper conduct, to plaintiffs in connection with the agreed settlement with Bohemen in the interference proceedings. Had the interference proceedings been prosecuted to final judgment, this would have unquestionably delayed the granting of the patent in suit."
164 F.2d, at 267.

On these issues, as well as the charge of price fixing, the district court found that the actions of the defendants were consistent with the lawful exercise of sound business judgment. The court's review of the pricing policies of the defendants and other drug manufacturers, as well as the trend of

---

**18.** Although the district court overruled the defendants' objection to the admissibility of Lidoff's testimony, it recognized that there was a serious question on this point. *See United States v. Morgan*, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941); *W. R. Grace & Co. v. Park Manufacturing Company*, 378 F.Supp. 976 (E.D.Ill.1974); cf. *American Cyanamid Company v. F.T.C.*, 363 F.2d 757, 779 (6 Cir. 1966).

market prices during the years in question support its findings on these issues. "The antitrust laws were not meant to prohibit businessmen from adopting sound business policies merely because competitors had already adopted the same or similar policy." [19]

Upon this appeal "[i]t is not enough that we might give the facts another construction, resolve the ambiguities differently, and find a more sinister cast to actions which the District Court apparently deemed innocent. * * * We are not given those choices, because our mandate is not to set aside findings of fact 'unless clearly errone-

ous.' " *United States v. Real Estate Boards*, 339 U.S. 485, 495, 70 S.Ct. 711, 717, 94 L.Ed. 1007 (1950). Since we conclude that the findings of the district judge were not clearly erroneous, the judgment below is affirmed.

*AFFIRMED.*

19. *Independent Iron Works, Inc. v. United States Steel Corp.*, 177 F.Supp. 743, 747 (N.D. Cal.1959), *aff'd* 322 F.2d 656 (9 Cir. 1963), *cert.* denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963).