## FLEER CORPORATION
### v.
### TOPPS CHEWING GUM, INC. and Major League Baseball Player's Association.

### Civ. A. No. 75–1803.

United States District Court,
E. D. Pennsylvania.

May 28, 1976.

Matthew M. Strickler, Philadelphia, Pa., for plaintiff.

Edwin P. Rome, Philadelphia, Pa., for Topps Chewing Gum.

Norman M. Berger, Philadelphia, Pa., for Major League Baseball Player's Assoc.

## MEMORANDUM

NEWCOMER, District Judge.

Fleer Corporation brought this action charging the defendants with violations of the antitrust laws in connection with the production and sale of baseball trading cards and similar products. Presently before the court is the defendants' motion to dismiss the complaint. This motion is based on three grounds—first, that Fleer lacks standing to litigate the alleged antitrust violations; second, that the complaint alleges no act which could have injured Fleer's business within the four year statute of limitations period; third, that the doctrine of collateral estoppel precludes Fleer from litigating essential issues which were decided adversely to its interests in a 1965 Federal Trade Commission proceeding. We have considered each of these arguments and have concluded that the motion should be denied.

The complaint's allegations draw the following picture. Fleer and Topps compete with one another in the manufacture of confectionary products and novelties, primarily for children. For each baseball season beginning in 1953, Topps has manufactured, distributed and sold an annual series of baseball trading cards, consisting of distinct cards for most of the then current major league baseball players. At all times the cards have been sold together with bubble gum. Since at least 1967, the cards have also been sold as separate items. Topps' baseball cards are a popular item, collected and traded by young (or youthful) sports enthusiasts. From its sales of cards, and of cards together with gum, Topps netted approximately six million dollars in sales in 1974. An essential ingredient to this enterprise and the keystone of Topps' dominance in this field is Topps' ownership of exclusive rights to use the names, pictures, signatures and biographical sketches of most current baseball players for their cards and similar products. Under a typical contract, a player awards these rights in exchange for a flat fee, and they cover the period of the first five baseball seasons thereafter during which the player is on a major league roster, with the right in Topps to extend those exclusive rights for an additional two baseball seasons. The contracts are negotiated on an ongoing basis, and their expiration dates are staggered. This arrangement severely disadvantages the prospective competitor. Even if it were so remarkably effective as to sign a contract with every ballplayer at the time his agreement with Topps expired, it would not be able to market a substantially complete set of cards for at least a few years.

Effective competition appears even more remote in the light of the complaint's allegations regarding the defendant, Major League Baseball Players Association. We are told that since at least as early as 1967, Topps, the Players Association and other persons have been engaged in a combination and conspiracy in restraint of trade in baseball cards and similar products. The Players Association is an unincorporated association which has encouraged major league baseball players to accept it as their representative in matters affecting their common interests. It is alleged that the Players Association encouraged major league baseball players to cease granting Fleer any further rights in connection with baseball trading cards. Eventually Topps and the Players Association entered into a ten year agreement under which Topps would make royalty payments to the Association in return for the Association's endorsement of Topps as the sole manufacturer and distributor of baseball trading cards and similar products. Royalties paid by Topps to the Association and to individual players amount to approximately $600,000 per year.

The complaint further states that Fleer has competed generally with Topps in the manufacture of bubble gum, candy and novelties since prior to 1960. On several occasions, most recently in 1974, Fleer has attempted to obtain the rights it would need

in order to produce a set of current major league baseball player picture cards. Allegedly, the defendants have stymied these efforts by unlawful actions. Fleer says that it is eager to compete with Topps in the manufacturing and selling of baseball trading cards and similar products; that it has a continuing intention to enter that market; and that it has the equipment and the resources to do so. The only asset it lacks is a set of suitable contracts with baseball players. However, it says it can take no realistic steps to acquire this asset so long as the defendants' alleged conspiracy continues.

## STANDING

■ In order to bring a suit for treble damages under the Clayton Act, 15 U.S.C. § 15, one must be

"injured in his business or property by reason of anything forbidden in the antitrust laws."

Fleer is not actually competing in the market in which the alleged antitrust violations have occurred but contends that these very violations are all that prevent it from entering that market and doing a vigorous business. It is not necessary to allege injury to an existing business. However, the prospective competitor must have the intention and preparedness to enter the relevant market.

■ Our problem is to apply the "intention and preparedness" test to the instant complaint. The defendants' contend that a bare allegation of intention and preparedness is an insufficient basis for standing under 15 U.S.C. § 15. They say the complaint must allege with specificity substantial steps taken by the plaintiff to compete in the manufacture and sale of current baseball player picture cards and similar products. It is clear that a proper plaintiff must have a more intense and concrete interest than a member of the general public, *Triangle Conduit and Cable Co. v. National Electric Products Corp.*, 152 F.2d 398, (3rd Cir. 1945), and that its intention to compete must be more than a mere hope, *Peller v. International Boxing Club, Inc.*,

277 F.2d 593, 596 (7th Cir. 1955). Objective signs of preparedness include among them:

"[T]he background and experience of the principals, including their previous successes or failures in the same or a related business as well as possession of the requisite skills and abilities . . . [T]he financial capability of the enterprise, which encompasses the extent of investment and the ability to finance operations and to make necessary purchases . . . [T]he taking of substantial affirmative actions toward entry . . ." *Denver Petroleum Corporation v. Shell Oil Company,* 306 F.Supp. 289, 308 (D.Colo.1969)

We think Fleer adequately alleges the plaintiff's background and experience in product markets related to the one in dispute, and its financial capability to compete. The complaint alleges, *inter alia:*

"From prior to 1960 to date, Fleer has competed generally with Topps in the manufacture of bubble gum, candy and novelties . . . Continuously, from 1967 to date, Fleer has had the manufacturing and marketing capability to manufacture, distribute and sell baseball trading cards and similar products, has been prepared to enter such market, and has a continuing intention to enter such market."

Whether Fleer has alleged taking substantial affirmative steps towards entry is a close question. The complaint states that prior to 1966, and then again in 1967, and 1968, Fleer attempted to obtain contracts granting it the rights necessary for producing trading cards and similar products, but was blocked by the defendants' conspiracy. Fleer says it ran into the same obstacle in 1974 when it

"attempted to obtain the right to use the names, pictures, signatures and biographical sketches of major league baseball players for use on pictures at least five inches by seven inches and costing at least twenty-five cents each . . ." Complaint, ¶ 12.

There is no elaboration which allows one to gauge with precision the intensity of these

attempts. It is significant, however, that there are alleged repeated attempts to enter over a number of years. Interpreting the allegations in the light most favorable to Fleer, it appears that Fleer tried different approaches to the problem of entry, but ceased each attempt when its futility became apparent. This futility is summed up in paragraph 13 of the complaint, which states in part:

"At no time since prior to 1967 has Fleer, or any other potential competitor, been able (i) to contract with any significant number of major league baseball players for the right to use the players'. names, pictures, signatures and biographical sketches on baseball trading cards or any similar product, or (ii) to manufacture, distribute, or sell baseball trading cards or any similar product in competition with baseball trading cards manufactured, distributed and sold by Topps . . . ."

Of course, Fleer may fail to show, ultimately, that the outlook for itself and other competitors was indeed so bleak. On a motion to dismiss, however, we must assume the truth of all well pleaded allegations in the complaint. We cannot find that Fleer's steps toward entry were insubstantial if it is true that the taking of any further steps would have been a sheer waste of resources. It would be inconsistent with one purpose of the Clayton Act—to protect the business interests of the victims of monopolistic practices—to require an antitrust plaintiff to pay a courtroom entrance fee in the form of an expenditure of substantial resources in a clearly futile competitive gesture.[1] Topps contends that Fleer could have entered the market by purchasing contract rights from players as their contracts with Topps expired. However, at this point in the case we must

accept Fleer's contention that the alleged conspiracy between the defendants would almost certainly have nullified such an effort.

The precedent which most strongly supports the defendant's position on the substantial effort question is *Duff v. Kansas City Star Company,* 299 F.2d 320 (8th Cir. 1962). In that case, the plaintiff was the former owner of a weekly newspaper in Kansas City, Missouri. He ceased publication during World War II and eight years later decided to revive his former enterprise. Allegedly, the plaintiff made an extensive sampling of the advertising market and newspaper industry, and discovered that because of the defendant's monopolistic practices it would be impossible for a new paper to compete successfully. The plaintiff alleged that he had made arrangements to have his paper printed and had located an office. He admitted that these actions did not involve large capital expenditures. It was held that the plaintiff had failed to allege damage to his business or property and therefore lacked standing to bring an antitrust action. Although there are facts which distinguish *Duff* from the instant case,[2] we think the holding was based on a principle we cannot accept, that is, that one must have an actual going business in order to sue for treble damages. That rule was rejected by a leading decision in this circuit, *Delaware Valley Marine Supply Company v. American Tobacco Company,* 184 F.Supp. 440, (E.D.Pa.1960), aff'd on other grounds, 297 F.2d 199 (3d Cir. 1961), cert. denied, 369 U.S. 839, 82 S.Ct. 867, 7 L.Ed.2d 843 (1962).

The district court stated therein:

"Defendant's argument necessarily presupposes that when Congress authorized treble damage suits it meant to distinguish between the rights of persons who

---

1. Cf. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 120 n. 15, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

2. In *Duff,* the plaintiff had no business at all whereas in the instant case the plaintiff is an actual competitor with the defendant in several product areas and has an ongoing business; the plaintiff in *Duff* did not presently own the

equipment necessary for competition nor did he have business resources in active operation whereas Fleer has alleged that its ongoing business enterprise includes many of the manufacturing and marketing operations that would be used in the manufacture and sale of baseball trading cards.

are put out of business and the rights of persons who are kept out of business by a conspiracy. It is unreasonable to suppose that such a distinction was intended by Congress. The purpose of the anti-trust laws is to promote competition and to prevent its restraint. This purpose is no less thwarted when a person who intends and is prepared to embark in trade is stopped at the outset, than it is when a going business is brought to a standstill. It is as unlawful to prevent a person from engaging in business as it is to drive him out of business. The restriction which defendants would place upon the meaning of the word 'business' is unwarranted in the context of the Clayton Act usage." (Citation omitted). 184 F.Supp. at 443. See also, *Denver Petroleum Corporation v. Shell Oil Company, supra,* at 307.

We conclude that the plaintiff's allegations of intention and preparedness are adequate to survive a challenge to its standing under 15 U.S.C. § 15. Having satisfied the standing requirements of 15 U.S.C. § 15, Fleer has standing to seek injunctive relief under 15 U.S.C. § 26. Accordingly, we need not discuss the plaintiff's standing under the latter section.

### STATUTE OF LIMITATIONS

■ The defendant argues that the plaintiff's treble damage claim is barred by the statute of limitations, 15 U.S.C. § 15b, which states in pertinent part:

"Any action to enforce any cause of action under sections 15 or 15a of this title shall be forever barred unless commenced within fours years after the cause of action accrued."

The application of this provision is particularly difficult in the instant case, because plaintiff alleges a continuing conspiracy by the defendants, and the plaintiff has not actually competed with the defendant in the allegedly monopolized field during the period of the statute of limitations.

Two leading cases in this area are *Zenith Radio Corporation v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971), and *Poster Exchange, Inc. v. Na-* *tional Screen Service Corporation,* 517 F.2d 117 (5th Cir. 1975). *Zenith* held that in the context of a continuing conspiracy to violate the antitrust laws, each time a plaintiff is injured by an act of the conspirators, a cause of action accrued to him to recover the damages caused by that act. For those damages the statute of limitations was said to run from the time the act occurred.

The complaint states a number of acts which the defendants have allegedly taken in furtherance of their conspiracy within the last four years, for example, renewing contracts, paying royalties, and telling baseball players not to sell certain rights to anyone but Topps. Fleer's problem is showing that some or all of these acts have caused it damage. Since Fleer has not competed with Topps in the baseball trading card market within the statutory period its argument is that the allegedly unlawful acts within this period injured its business by perpetuating its exclusion from the market. Of course, these acts can only be said to have contributed to Fleer's exclusion if Fleer otherwise would have entered the market. Fleer's allegations of intention and preparedness to enter the market, which we have just discussed, are crucial to its claim that it would have entered the market and garnered economic gain except for defendants' unlawful acts within the statutory period.

*Poster Exchange, supra,* is an instructive case because it also deals with a plaintiff who alleged that it was frozen out of a market. The plaintiff, a distributor of motion picture posters and related accessories, charged that the National Screen Service Corporation and six producers refused to deal with the plaintiff. On the statute of limitations question, the court distinguished between past events whose impact was sustained prior to the statutory period, and continuing violations which might cause repeated cognizable injury during the statutory period, even though the conspiracy began prior to that period. About the first situation the court said:

"Where the violation is final at its impact, for example, where the plaintiff's

business is immediately and permanently destroyed, or where an actionable wrong is by its nature permanent at initiation without further acts, then the acts causing damage are unrepeated, and suit must be brought within the limitation period and upon the initial act. But here, where the action complained of was the exclusion of Poster from any participation in the standard accessory industry, such action, while perhaps unequivocal, was not of necessity permanent  .   .   . [E]ach injurious act of a continuing conspiracy gives rise to an anti-trust cause of action   .   .   ." (Footnotes and citations omitted) 517 F.2d at 126–127.

The court went on to say:

"It remains clear nonetheless that a newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action." 517 F.2d at 128.

On the statute of limitations issue the court focused on whether the plaintiff had tried to gain access to the relevant market during the statutory period but had been rebuffed by the defendant. The court held that Poster's claim against one defendant, Columbia, was barred because the plaintiff had failed to demonstrate that Columbia had refused it access to standard accessories during the statutory period. However, the case was remanded for further findings with respect to defendant National Screen. In an affidavit, National Screen denied that Poster had made any demands upon it for access to standard accessories during the relevant time period. But the Court of Appeals accepted the district court's decision to interpret the plaintiff's affidavit to contain an allegation that the defendant had continued to refuse to deal in the accessories. Hence, the trial court was called upon to decide whether there was a triable issue of fact on this issue.

"As the foregoing discussion makes clear, we think it critical that the court determine whether there was, during the period sued upon, a mere absence of deal-ing, or whether there was some specific act or word precluding Poster from obtaining supplies from National Screen." 517 F.2d at 128.

In the instant case, Topps contends that Fleer has not alleged any unsuccessful attempts to gain access into the relevant market, and thus could have incurred no injury within the statutory period. However, paragraph 12 of the complaint alleges that in 1974, Fleer attempted to obtain the necessary contract rights for producing a set of baseball player pictures on cards measuring five inches by seven inches, but was prevented from fulfilling its objectives because of the unlawful actions of the defendant. The defendant says that this allegation is irrelevant because pictures measuring five inches by seven inches are not within the relevant market as defined by the complaint. We think, however, that a fair reading of paragraph 4 of the complaint would include such a novelty item. Consequently the complaint satisfies the requirement that it allege an act or word by the defendant causing injury to the plaintiff— here, by creating another barrier to entry into the relevant market. Any attempt by Fleer to enter the relevant market which was hindered by an act of a defendant in furtherance of the alleged continuing conspiracy may have caused Fleer injury.

## COLLATERAL ESTOPPEL

In order to establish liability under the antitrust laws, Fleer must prove that commerce in baseball trading cards and similar products is a distinct and substantial market. *United States v. E. I. DuPont de Nemours and Company*, 353 U.S. 586, 593, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957); *Crown Zellerbach Corp. v. Federal Trade Commission*, 296 F.2d 800 (9th Cir. 1961). In a proceeding that culminated in 1965, the Federal Trade Commission decided that the sale of baseball trading cards not in combination with bubble gum, did not constitute a commercially meaningful market. The Commission also found that the use of trading cards as a promotional device for the sale of gum did not give Topps monopoly

power in the bubble gum market. (There was no dispute that the bubble gum market was distinct and substantial.) Topps now contends that Fleer was a *de facto* party to the FTC adjudication and that the decision is collateral estoppel against Fleer, preventing it from relitigating the issue of market definition.

◼ Although collateral estoppel is an affirmative defense, it may be raised in a motion to dismiss for failure to state a cause of action. *Meetings and Expositions, Inc. v. Tandy Corp.,* 490 F.2d 714 (2d Cir. 1974); *Connelly Foundation v. School District of Haverford Township,* 461 F.2d 495 (3d Cir. 1972), *County of Lancaster v. Philadelphia Electric Company,* 386 F.Supp. 934, 937 (E.D.Pa.1975). If the facts supporting the defense do not appear plainly upon the face of the complaint, but evidentiary matter outside the complaint is submitted to the court, then the court must decide between excluding those matters, or considering them and thereby treating the motion as one for summary judgment to be disposed of as provided in Fed.R.Civ.P. 56. If the court shifts the motion into a summary judgment posture, it must give the plaintiff an opportunity to submit opposing affidavits and, if necessary, have discovery. *Meetings and Expositions, Inc. v. Tandy Corp., supra,* at 717.

◼ There is no question that a dismissal on collateral estoppel grounds cannot be based on the face of this complaint. Topps' motion is based on material outside the pleadings—copies of official reports emanating out of the FTC proceeding. The motion raises, on the one hand, difficult legal issues which have not been fully briefed, and, on the other, factual issues on which the plaintiff is entitled to take dis-

covery prior to our deciding whether the defendant should be granted summary judgment. At this time, we decline to treat the motion as if for summary judgment.[3]

Topps was a respondent in an FTC proceeding. Having prevailed in that proceeding it is now trying to make defensive use against Fleer of the agency adjudication. Fleer was not a formal party to the agency action, nor was it in privity with a party. Topps alleges however, that Fleer took such an active part in the FTC hearings, and its interests were so aligned with those of the FTC complaint counsel, that it had a "full and fair opportunity . . . to present [its] evidence and arguments on the claim," *Blonder-Tongue Labs. v. University Foundation,* 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788 (1971) (defensive use by non-party) and thus it fully and fairly litigated the claim. If all of Topps factual allegations are true,[4] and if common law collateral estoppel doctrines are applicable to the instant case, then Topps has a sound defense.[5] We have already explained why the factual issues are not ripe for decision. We now turn to an analysis of the second assumption in the above equation—whether common law collateral estoppel is applicable in this case.

Several courts have said that the antitrust statutes pre-empt common law collateral estoppel. In *State of North Carolina v. Charles Pfizer & Co., Inc.* (4th Cir. 1976), 537 F.2d 67, 1975–2 Trade Cases, par. 60,663, the Fourth Circuit commented:

> "[B]y the very terms of the Federal Trade Commission Act, proceedings under Section 5 appear to be incompatible with the doctrine of collateral estoppel. Section 5(e) of the Act reads:
>
> No order of the Commission or judgment of the court to enforce the same

---

3. At the next pretrial conference in this case the court will establish a discovery schedule and entertain requests for scheduling summary judgment motions.

4. Including those which negate Fleer's contentions that there have been changed conditions since 1965 which defeat collateral estoppel. See *Greene v. General Foods Corp.,* 517 F.2d 635, 659 (5th Cir. 1975).

5. See *Scooper Dooper, Inc. v. Kraftco Corp.,* 494 F.2d 840, 844 (3d Cir. 1974), *Cf. International Telephone and Telegraph Corp. v. General Telephone and Electrics Corp.,* 380 F.Supp. 976 (M.D.N.C.1974); Note, Collateral Estoppel of Nonparties, 87 Harv.L.Rev. 1485 (1974).

shall in any wise relieve or absolve any person, partnership, or corporation from any liability under the Antitrust Act." *State of North Carolina v. Charles Pfizer & Co., Inc.* (4th Cir. 1976), 537 F.2d 67, at 74, 1975–2 Trade Cases, ¶ 60,663 at 67,905.

The opinion also referred to section 5(a) of the Clayton Act, 15 U.S.C. sec. 16(a),[6] which provides that a civil judgment or criminal conviction won by the government under the antitrust laws shall be prima facie evidence against the party in subsequent private antitrust actions.

Congress enacted section 5(a) in 1914. At that time, the mutuality doctrine barred the use of collateral estoppel by a non-party. *Bigelow v. Old Dominion Copper Co.,* 225 U.S. 111, 32 S.Ct. 641, 56 L.Ed. 1009 (1912). Thus, Congress gave the private antitrust plaintiff an advantage that was not otherwise available. The objective of the change was to strengthen the private enforcement mechanism in the antitrust scheme. Once the government expended its resources in a successful antitrust prosecution, the violator's competitors could prosecute treble damage actions relatively inexpensively, relying on the government's victory to supply their prima facie case.[7] *New Jersey v. Morton,* 387 F.2d 94 (3d Cir. 1967), *cert. denied* 391 U.S. 967, 88 S.Ct. 2035, 20 L.Ed.2d 880 (1968), *Emich Motors Corp. v. General Motors Corp.,* 340 U.S. 558, 568, 71 S.Ct. 408, 95 L.Ed. 534 (1950), *rehearing denied* 341 U.S. 906, 71 S.Ct. 610, 95 L.Ed. 1345 (1951). The lingering threat of private damage actions raised the stakes for the defendant in the government-initiated action, giving the government more leverage for negotiating consent orders. A student of the legislative history reports that the original draft of section 5(a) stated that a judgment of liability in a suit brought by the government would be "conclusive" in a subsequent private damage suit; the phrase "prima facie evidence" was substituted in the final version only because the legislators feared their first draft would be found to violate the Due Process Clause. *Section 5(a) of the Clayton Act and the Use of Collateral Estoppel by a Private Plaintiff in a Treble Damage Action, 8 U. of San Francisco L.Rev. 74 (1973).*

It has been held that an FTC adjudication that a party violated the Clayton Act is an antitrust decree within the meaning of section 5(a).[8] *Farmington Dowel Products Co. v. Foster Mfg. Co.,* 421 F.2d 61 (1st Cir. 1970); *Purex Corp., Ltd. v. Proctor & Gamble Co.,* 308 F.Supp. 584 (C.D.Cal.1970), *aff'd* on other grounds 453 F.2d 288 (9th Cir. 1971), *cert. denied* 405 U.S. 1065, 92 S.Ct. 1499, 31 L.Ed.2d 795 (1972), *Viking Threatre Corp. v. Warner Bros. Pictures Dist. Corp.,* 264 F.Supp. 665 (E.D.Pa.1967). The rationale of these decisions is that Commission procedures are adequate assurance that a party has his "day in court." If collateral estoppel is applicable at all in the antitrust context, the logical extension of this rule is that an FTC adjudication of an antitrust claim should be given the force of a judgment.[9]

---

6. 15 U.S.C. Sec. 16(a) reads:
   "(a) A final judgment or decree heretofore or hereafter rendered in any civil or criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant under said laws or by the United States under section 15a of this title, as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto: Provided, That this section shall not apply to consent judgments or decrees entered before any testimony has been taken or to judgments or decrees entered in actions under section 15a of this title."

7. Section 5(b), 15 U.S.C. 16(b), tolled the statute of limitations on the private actions pending the government initiated proceedings.

8. However, an FTC finding of a violation of sec. 5(a)(1) of the Federal Trade Commission Act is not an antitrust decree. The FTC Act is not enumerated in section 1 of the Clayton Act, 15 U.S.C. sec. 12, as an "antitrust law." In *State of North Carolina v. Charles Pfizer & Co.,* supra, the Fourth Circuit noted that the scope of liability under the FTC Act is broader than under the Clayton Act.

9. *But see United States v. Chas. Pfizer & Co.,* 205 F.Supp. 94, 96 (S.D.N.Y.1962).

No court has squarely held that the common law doctrine of collateral estoppel applies in antitrust litigation, notwithstanding section 5(a) of the Clayton Act. One court has leaned very far in that direction, however.

"[T]he statutory history seems to suggest that Congress only intended to set a minimum standard for the effect of prior government antitrust judgments, thereby leaving the courts free to apply in accordance with constitutional limitations any common law doctrines which would increase the effect of the prior judgment beyond the prima facie evidence standard. See Emich Motors Corp. v. General Motors Corp., 340 U.S. at 567–68, 71 S.Ct. 408, 95 L.Ed. 534 (1951); City of Burbank v. General Electric Co., 329 F.2d 825, 831 (9th Cir. 1964); Minnesota Mining and Manufacturing Co. v. N. J. Wood Co., 381 U.S. 311, 319, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965); 51 Cong.Rec. 16,276 (Oct. 7, 1914); S.Rep.No.698, 63rd Cong., 2d Sess., 45 (July 22, 1914)." McCook v. Standard Oil, 393 F.Supp. 256, 259–60 (C.D.Cal. 1975), (dictum) [10]

Other courts have found that there is a pre-emption. Purex Corp. v. Proctor and Gamble Co., 308 F.Supp. 584 (C.D.Cal.1970), Delux Theatres Corp. v. Balabon and Katz Corp., 95 F.Supp. 983, 986 (N.D.Ill.1951), U. S. v. Grinnell Corp., 307 F.Supp. 1097 (S.D. N.Y.1969). In Rachal v. Hill, 435 F.2d 59 (5th Cir. 1970), the court held that collateral estoppel could not be applied where it would eliminate a litigant's right to trial by a jury.[11]

It seems odd that a statutory provision which was enacted to strengthen antitrust plaintiffs should now be interpreted to make them worse off in many cases than they would have been without the enactment. When a plaintiff is denied the conclusive effect of collateral estoppel, the defendant can put on evidence controverting the plaintiff's prima facie case. The plaintiff must meet that evidence, even though the defendant's position has already been rejected in a prior case after a full hearing. The instant case, of course, involves the defensive assertion of collateral estoppel,[12] whereas 15 U.S.C. § 16a expressly refers only to plaintiff's use of prior judgments. Our analysis is premised on the idea that the application of collateral estoppel doctrine to antitrust litigation should be consistent, and therefore the interpretation of 15 U.S.C. § 16a is also determinative of defensive collateral estoppel. If there is a preemption, we think it applies to both offensive and defensive use. A selective preemption of offensive collateral estoppel would create the anomaly that a statute

10. The court's reading of the legislative history agrees with the thesis of the commentary, section 5(a) of the Clayton Act, 8 U. of San Francisco L.Rev. 74 (1973).

11. In Rachal, the Securities and Exchange Commission filed a complaint for an injunction which led to an adjudication that the defendant had violated the securities laws. Subsequently, a private party—a stranger to the SEC action—brought a damage action against the defendant and asserted the adverse determination of liability in the former action against the defendant. In the injunctive action the defendant had no jury trial right; in the damage action it did. Allowing the plaintiff to use the judgment from the first case as an estoppel in the second would defeat the jury trial right. This, the court reasoned, presented an "overriding consideration of fairness," Bruszewski v. U. S., 181 F.2d 419, 421 (3d Cir. 1950), which precluded collateral estoppel. In the instant case, Fleer has expressly waived its right to a jury trial, so Rachal is distinguishable.

12. The defendants' position may be sui generis. It is infrequent that a defendant can make a plausible claim that the plaintiff had a full and fair opportunity to present its evidence and arguments in an FTC proceeding brought on a commission complaint. The initial decision of the Hearing Examiner lends substance to Topps' claim. It states, inter alia:

Fleer's representatives were star witnesses and, in proportion, carried the burden of making the record in this proceeding. They were in constant attendance throughout the hearing . . . .. In retrospect, much of the struggle for contracts with ballplayers seems to be Fleer's private struggle with Topps . . . .. The Hearing Examiner is, however, of the opinion that the delegation of the Commission's "adjudicative fact-finding functions" does not embrace a policy question going to the public interest. 67 F.T.C. at 777.

originally enacted to give plaintiffs an advantage now would have the effect of denying them the use of common law collateral estoppel at the same time it was available to defendants.[13]

The pre-emption issue was not raised by either party. Whether we will be called upon, of necessity, to decide the question is still open. The factual record may show that in this case the collateral estoppel defense, assuming the applicability of the doctrine is without merit. The issue could then be disposed of on the facts without resolving a difficult legal question which is more suitable to legislative then to judicial decision.

**13.** We note (without endorsement) that a selective application of collateral estoppel whereby antitrust plaintiffs could use it but defendants could not, would be consistent with the plaintiff bias in 15 U.S.C. § 16a. Hence, the pre-emption issue presents the alternatives of pre-emption; no pre-emption; and selective pre-emption.